THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

ATAKAPA INDIAN                  Civil Action No: 3:19-cv-00028-SDD-EWD
de Creole NATION                Complaint: Class Action

                                District Court Chief Justice:   Madam Shelly Dick
        Plaintiff               Magistrate Judge:               Erin Wilder-Doomes

        V

LOUISIANA through the Council for the Success of Black men and Boys
Governor's office of Indian Affairs, and THE UNITED STATES through Attorney General et al

        Defendant

_____

AMENDED APPLICATION FOR PRELIMINARY
AND PERMENANT INJUNCTION 15 USCA §1- 2 et seq
CLASS ACTION PETITION TO FIX BOUNDRY, FOR DAMAGES AND FOR
DECLARATORY JUDGMENT

_____

MAY IT PLEASE THE COURT:

Table of Contents:

I.      INTRODUCTION ....................................................................................................6

  a.    CLASS ACTION- Prerequisites.................................................................................. 7

  b.    There are questions of law or fact common to the class;.............................................. 8

  c.    The Doctrine of Title by Discovery and Doctrine of Conquest...................................... 11

II.     they will continue to suffer irreparable injury if a temporary restraining order and a
preliminary and permanent injunction is not granted ................................................14

        1.   8 U.S.C.A. § 1401. Nationals and citizens of United States at birth...................................... 15
        2.   Declaratory relief as to citizenship. Tribal Allegiance vs the 14th Amendment................................. 15
        3.   Guardian and Ward ............................................................................................. 16
        4.   Law of Trusts .................................................................................................. 17
        5.   United States and State of Louisiana Breach of Fiduciary Duty ........................................ 17
        6.   The Doctrine of Discovery vs The Sadistic Doctrine of European Conquest............................... 19
        7.   Right of Election to become citizens of the United States ............................................... 27
        8.   An Indigenous American of the Louisiana Territory is not a United States Citizen ................................ 29
        9.   European invaders cannot impose nationality on natural born residents without their consent. ........ 30
        10.  Conflict of interest between guardian and ward; appointment of Guardian ad litem is necessary ....... 31
        11.  U.S. Const. art. VI, cl. 2 Supreme Law of the Land specifically states:...................................... 32
        12.  The French Convention of 1800 between the French Republic and the United States: ........................ 32
        13.  Oil and Gas Leases ............................................................................................. 33

1

III.    that an injunction would not substantially injure other interested parties ....................34
    1.    111TH CONGRESS 1ST SESSION ACKNOWLEDGMENT AND APOLOGY to American Native people....... 34
    2.    111TH CONGRESS 1ST SESSIONS. Apology to "African-Americans" for slavery and Jim Crow Laws.......... 34
    3.    United States and Louisiana (New Spain) conveyance of Land and water Titles .................................... 35
    4.    Violation of the Commerce Clause of the United States Constitution (U.S. Const. art. I, § 8, cl. 3) ........ 35

IV.    Public Interest Favors a Temporary Restraining Order and preliminary and permanent injunction ..................................................................................................................................36
    1.    American-l'iberian Indian Tribe of משה Moses Family Integrity ................................................... 37

V.    His Majesty is likely to Succeed at Trial ....................................................................................37
    1.    Jurisdiction – United States and Louisiana; .................................................................................. 38
    2.    The 1803 Louisiana Purchase Treaty is not law because it was not ratified by the US Congress........... 39
    3.    The April 30, 1803 Louisiana Purchase Treaty.................................................................................... 41
    4.    Annulment of 1795 Spanish Treaty ................................................................................................... 43
    5.    message to Indian Chief Brother Handsome Lake, United States President Thomas Jefferson........... 44
    6.    ART. II. Of the Treaty of October 27, 1795; the United States Boundary lines ...................................... 45
    7.    ART. V. Of the Treaty of October 27, 1795; actio utilis ..................................................................... 45
    8.    John Adams - June 12, 1797; Message to the Senate and House; ...................................................... 47
    9.    Jefferson's Draft on an Amendment to the Constitution: 1803 ........................................................ 47
    10.    8 U.S.C.A. § 1489. Application of treaties; exceptions ..................................................................... 48
    11.    28 U.S.C.A. § 1333. Admiralty, maritime and prize cases ................................................................ 48

    11.    U.S. Const. amend. V Takings clause ................................................................................................ 48

    12.    EQUAL PROTECTION VIOLATIONS .................................................................................................. 48
    1.    42 U.S.C.A. § 1981. Equal rights under the law ................................................................................ 48
    2.    La. Rev. Stat. Ann. § 49:1212 Council on the Success of Black Men and Boys ...................................... 49
    3.    Body corporate; powers ..................................................................................................................... 49
    4.    Is the United States a Corporation that is subject to suit?.................................................................. 51

    Yes, under 28 U.S.C.A. § 3002 Federal Debt Collection Procedure .......................................... 51

    Definition.................................................................................................................................... 51

    13.    Vested Rights .................................................................................................................................... 52
    1.    A vested right  may not constitutionally be divested under Due Process and Contract Clauses ........... 52
    2.    28 U.S.C.A. § 2241 Application for Writ of Habeas Corpus .............................................................. 55
    3.    Baton Rouge City Police Alarm Use Violation Final Notice ................................................................ 55
    4.    The Atakapa Indian Nation of Spanish Louisiana is an Absolute sovereign and independent Nation .... 56
    5.    Application for Writ of Habeas Corpus is not confined to those in jail or like physical confinement ...... 57

ORDER .......................................................................................................................................62

AMENDED COMPLAINT ............................................................................................................76
    1.    NATURE OF CASE – US and Louisiana - 28 U.S.C.A. § 2201 Declaratory Judgement: .......................... 77
    2.    Legal Relations between the Indigenous people and the United States Government.......................... 77
    a.    Louisiana Purchase is an IMPLIED LEASE AGREEMENT: .................................................................. 77
    3.    NATURE OF THE CASE – Sherman Act .............................................................................................. 81

    14.    NATURE OF THE ACTION – Thomson Reuters ................................................................................ 82

    15.    PARTIES TO THE ACQUISITION -Thomson and Reuters ................................................................ 82

    16.    JURISDICTION .................................................................................................................................. 83

    17.    JURISDICTION - Personal Jurisdiction. ............................................................................................. 83

18.     JURISDICTION - Subject Matter Jurisdiction ............................................................. 84

19.     JURISDICTION OVER FOREIGN NATIONS ................................................................. 86

20.     28 U.S.C.A. § 1604. Immunity of a foreign state from jurisdiction........................... 86

21.     28 U.S.C.A. § 1605 General exceptions to the jurisdictional immunity of a foreign state ....... 86

22.     CORPORATE JURISDICTION (The Christian Crown – Corporate Sole) ...................... 87

23.     Article III Louisiana Purchase Treaty 1803.............................................................. 88

24.     Etymology of Incorporate:........................................................................................ 88
     1.     INCORPORATE late 14c.,............................................................................................ 88

25.     La. Rev. Stat. Ann. § 49:1212 Louisiana Council for the Success of Black Men and Boys......... 88
     2.     A Corporation Sole ....................................................................................................... 89

26.     Diversity Jurisdiction 28 U.S.C.A. § 1332 ................................................................ 89

27.     The International Commercial Code – § 5-102.Definitions., U.C.C. Text § 5-102.................... 89

28.     15 U.S.C.A. § 1. Trusts, etc., in restraint of trade illegal; penalty ............................. 90

29.     15 U.S.C.A. § 2. Monopolizing trade a felony; penalty............................................. 90

30.     15 U.S.C.A. § 6a Conduct involving trade or commerce with foreign nations .......................... 91

31.     such conduct has a direct, substantial, and reasonably foreseeable effect— ........................ 91

32.     La. Rev. Stat. Ann. § 25: 701. Recognition of Historic Louisiana Region ................... 95

33.     La. Rev. Stat. Ann. § 25:702 Baton Rouge as "Birthplace of Louisiana Democracy" .............. 95

34.     La. Rev. Stat. Ann. § 25:703 Florida Parishes as "Birthplace of Freedom in Spanish America" 95

35.     La. Rev. Stat. Ann. § 25: 711. Relations with other states........................................ 96

36.     VENUE ................................................................................................................... 97

37.     PARTIES ................................................................................................................. 97
     3.     CO-CONSPIRATORS AND AGENTS............................................................................. 141
     4.     CLASS ACTION ALLEGATIONS .................................................................................. 142

276.    Defendants Are Competitors.................................................................................. 144

I.      THAT THEY WOULD SUFFER IRREPARABLE INJURY IF INJUNCTION IS NOT GRANTED ...145
     5.     MORTON'S SALT – New Iberia YOU ARE THE SALT OF THE EARTH.... Mathew 5:13 ........... 150

1.      Louisiana was identified as a rebellious State ......................................................... 152

II.     THE THREATENED INJURY TO THE MOVANT OUTWEIGHS WHATHER DAMAGE THE
PROPOSED INJUNCTION MAY CAUSE TO OPPOSING PARTY ....................................................154
     6.     FREEDMAN'S BUREAU – We are Free men let us Stand as Free men ................................ 154

279.    Iberia Parish (French: Paroisse de l'Ibérie...) is the parish seat is New Iberia ...................... 156
     7.     FREEDMAN'S BANK - BACKGROUND AND REASONS FOR URGENCY- Currency Markets................... 156
     8.     Under 73 Cong. Ch. 576 congress authorized the establishment of a credit system for Indians.......... 157
     9.     VIOLATION OF Civil Rights Act of 1871 – KU KLUX KLAN ACT.......................................... 159
     10.    JIM CROW LAWS.................................................................................................... 160
     11.    REDLINING.......................................................................................................... 162
     12.    WAR ON DRUGS ................................................................................................... 164

13.    DRUG CZAR ......................................................................................................... 165
14.    US Agencies accused of trafficking Drugs ........................................................... 165
15.    PRISON INDUSTRY COMPLEX ............................................................................... 166
a.     Minority ............................................................................................................... 169
b.     School-to-prison pipeline reform ........................................................................ 169
16.    PREMATURE ABORTION OF RECONSTRUCTION PERIOD ....................................... 170
17.    UNITED STATES ATTORNEY GENERAL'S OFFICE .................................................... 172
18.    ESSENTIAL FACTILITIES - The BEP's Western Currency Facility ............................. 173
19.    CUSTODY OF GOLD CERTIFICATES, SERIES OF 1934. ............................................ 174
20.    State Street Rules for WM/Reuters Rates Setting ............................................... 178
21.    WM/Reuters Rates' Use as a Pricing Mechanism ................................................ 179
22.    Defendants' Anti-Competitive Conduct .............................................................. 181

393.   Government Investigations ................................................................................. 184
23.    Injury to The Christian Emperor D'Orleans ......................................................... 185
24.    FRAUDULENT CONCEALMENT ............................................................................. 185
25.    FIRST CLAIM FOR RELIEF – Violation of Anti-Trust Act ........................................ 187
26.    SECOND CLAIM FOR RELIEF ................................................................................. 188
27.    THIRD CLAIM FOR RELIEF .................................................................................... 190
28.    FOURTH CLAIM FOR RELIEF ................................................................................. 191
29.    TRADEMARK INFRINGEMENT - TEMPORARY RESTRAINING ORDER ..................... 192
30.    FIFTH CLAIM FOR RELIEF - Tortious Interference with Business Relationship........ 194
31.    La. Rev. Stat. Ann. § 13:5111 Appropriation of property by state, parish, municipality or agencies
       thereof; attorney, engineering and appraisal fees; prescription .................................... 195
32.    SIXTH CLAIM FOR RELIEF - Reparian Ownership – Class Action ........................... 196

d.     Louisiana Civil Code art. 456 Banks of navigable rivers or streams ........................... 196
33.    SEVENTH CLAIM FOR RELIEF - Breach of Implied Duty of Good Faith and Fair dealing ...... 198
34.    EIGTH CLAIM FOR RELIEF – BREACH OF CONTRACT .............................................. 199
35.    NINTH CLAIM FOR RELIEF - *Right to Assert an Inverse Condemnation Claim* ..................... 199
36.    TENTH CLAIM FOR RELIEF - *Third Party Beneficiaries - stipulation pour autrui* ..................... 199
37.    ELEVENTH CLAIM FOR RELIEF - *Recovery in Tort (Continuing)* ......................... 202
38.    U.S. Const. amend. V Takings clause .................................................................... 204
39.    TWELTH CLAIM FOR RELIEF – Declaratory Relief ................................................ 205

III.    REQUEST FOR RELIEF ...............................................................................................209

Cases

137 S. Ct. at 1783–84.....................................................................................................................7, 84
Alabama-Coushatta Tribe of Texas v. United States, 757 F.3d 484 (5th Cir.2014)..................................7, 31
*Animal Sci. Products, Inc. v. China Minmetals Corp.,* 654 F.3d 462, 466 (3d Cir.2011), as amended (Oct. 7, 2011) ... 7,
       85
*Animal Sci. Products, Inc. v. China Minmetals Corp.,* 654 F.3d 462, 467 (3d Cir.2011), as amended (Oct. 7, 2011) ... 7,
       85
*Animal Sci. Products, Inc. v. China Minmetals Corp.,* 654 F.3d 462, 470 (3d Cir.2011), as amended (Oct. 7, 2011) ... 7,
       93
*Areeda & Hovenkamp,* ¶ 236'a at pp. 306–07 (1993 Supp.); see Murphy, supra n. 8, at 786–91 .........................7, 93
*Arthur Murray, Inc. v. Reserve Plan, Inc.,* 406 F.2d 1138 (8th Cir.1969).................................................7, 91
Arthur Murray, Inc. v. Reserve Plan, Inc., 406 F.2d 1138, 1145 (8th Cir.1969)..........................................7, 91
Atakapa Indian de Creole Nation v. Louisiana, 6:18-CV-00190, 2018 WL 42228 30, (W.D. La. July 23, 2018)........7, 96
Atakapa Indian de Creole Nation v. Louisiana, 6:18-CV-00190, 2018 WL 4222830, at *1 (W.D. La. July 23, 2018)7, 59

Atakapa Indian de Creole Nation v. Louisiana, 6:18-CV-00190, 2018 WL 4222830, at *3 (W.D. La. July 23, 2018), report and rec .................................................................................................................................7, 58

Becker v. Egypt News Co., Inc., E.D.Mo.1982, 548 F.Supp. 1091, affirmed 713 F.2d 363 ...................................7, 91

Bendix Corp. v. Balax, Inc., C.A.7 (Wis.) 1972, 471 F.2d 149, 176 U.S.P.Q. 33, certiorari denied, 94 S.Ct. 43, 414 U.S. 819, 38 L.Ed.2d 251, 179 U.S.P.Q. 321................................................................................................................7, 91

BNSF Railway Company v. Tyrrell, 137 S. Ct. 1549 (2017) ...............................................................................7, 84

Bristol-Meyers Squibb Company v. Superior Court of California, San Francisco County, 137 S. Ct. 1773 (2017) ...7, 84

Busch v. Buchman, Buchman & O'Brien, Law Firm, 11 F.3d 1255, 1258 (5th Cir. 1994) .......................................7, 84

Carpet Group, 227 F.3d at 72 .........................................................................................................................7, 93

Johnson v. M'Intosh, 21 U.S. 543, 587, 5 L.Ed. 681 (1823) ................................................................................ 155

Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984)........................................................ 52

McGlinchy v. Shell Chemical Co., 845 F.2d 802, 813 (9th Cir.1988 ...................................................................... 93

McSparran v. Weist, C.A.3 (Pa.) 1968, 402 F.2d 867, certiorari denied 89 S.Ct. 1739, 395 U.S. 903, 23 L.Ed.2d 217.31

Mills v. Dist. of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ...................................................................14, 27

Ozaltin v. Ozaltin, 708 F.3d 355 (2d Cir.2013) .................................................................................................... 55

P. Areeda & H. Hovenkamp, Antitrust Law ¶ 236'a at pp. 306–07 (1993 Supp.) ................................................... 93

Pells v. Webquish, 129 Mass. 469; Mass. St. 1862, c. 184; 1869, c. 463 ............................................................... 17

Philip Areeda, Essential Facilities: An Epithet in Need of Limiting Principles, 58 Antitrust L.J. 841, 853 n.21 (1989 . 95

Ream v. Frey, 107 F.3d 147, 153-54 (3d Cir. 1997)............................................................................................... 18

Roland..................................................................................................................................................................... 52

Santosky v. Kramer, 455 U.S. 745, 766-67 (1982)] .............................................................................................. 37

Schine Chain Theatres v. U.S., N.Y.1948, 68 S.Ct. 947, 334 U.S. 110, 92 L.Ed. 1245, petition denied 68 S.Ct. 1343, 334 U.S. 809, 92 L.Ed. 1758 ....................................................................................................................... 91

See Bowles v. Russell, 551 U.S. 205, 212, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007) ............................................... 85

See H.K. Porter Company v. Metropolitan Dade County, 650 F.2d 778 (5th Cir.1981); Save the Bay, Inc. v. The United States Army, 639 F.2d 1100 (5th Cir.1981) .............................................................................................. 14

See M.M.M. v. Sessions, No. 18-cv-1832, Order Granting Plaintiffs' Motion for Temporary Restraining Order (S.D. Cal., August 16, 2018 ............................................................................................................................... 37

See MCI Communications Corp. v. AT&T, 708 F.2d 1081, 1132–33 (7th Cir.1983 ................................................ 95

see, e.g., Wooley v. City of Baton Rouge, 211 F.3d 913, 923 (5th Cir. 2000) ......................................................... 37

Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1204–05 (2d Cir. 1970) .................................................. 52

Sheldon v. Sill, 49 U.S. (8 How.) 441, 449, 12 L.Ed. 1147 (1850) ......................................................................... 85

Skidmore Energy, Inc. v. KPMG LLP, No. 3:03-CV-2138-B, 2004 WL 3019097, at *8 (N.D. Tex. Dec. 28, 2004)......... 92

State of Ga. v. Evans, 316 U.S. 159, 162, 62 S.Ct. 972, 974, 86 L.Ed. 1346 (1942 ............................................... 83

State of Louisiana v. Judge of Commercial Court, 15 La. 192, 193 (1840)............................................................. 59

Submersible Sys. v. Perforadora Cent., 249 F.3d 413, 418 (5th Cir. 2001 ........................................................... 83

The Amistad, 40 U.S. 518, 10 L.Ed. 826 (1841)............................................................................................194, 195

The In Porters, S.A. v. Hanes Printables, Inc., 663 F.Supp. 494, 498–99 (M.D.N.C.1987)....................................... 93

TV Signal Co. of Aberdeen v. American Tel. & Tel. Co., C.A.8 (S.D.) 1972, 462 F.2d 1256......................................... 91

U.S. v. Grinnell Corp., U.S.R.I.1966, 86 S.Ct. 1698, 384 U.S. 563, 16 L.Ed.2d 778............................................... 91

Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd., 16-10985, 2018 WL 914780 (11th Cir. Feb. 16, 2018 ........................................................................................................... 55

Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd., 16-10985, 2018 WL 914780 (11th Cir. Feb. 16, 2018) ......................................................................................................... 55

United States v. Cooper Corp., 312 U.S. 600, 604, 61 S.Ct. 742, 743, 85 L.Ed. 1071 (1941).................................... 52

United States v. Dunn, 268 U.S. 121, 45 S.Ct. 451, 69 L.Ed. 876 (1925 .............................................................. 34

United States v. General Motors Corp., 384 U.S. 127, 142-143, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966)........... 91

United States v. Griffith, 334 U.S. 100 at 105, 106, 68 S.Ct. 941, 92 L.Ed. 1236 (1948) ......................................... 91

Wooley v. City of Baton Rouge, 211 F.3d 913, 923 (5th Cir. 2000) ....................................................................... 37

Statutes

§ 13.36.370. Trust protector ................................................................................. 113

28 U.S.C. s 2241 .................................................................................................... 10

46 App. USCA §  743 ............................................................................................. 88

46 App. USCA §  745 § 30911 .............................................................................. 88

46 U.S.C.A. § 30911 .............................................................................................. 88

48 Stat. 984 ............................................................................................................ 22

St. of 1869, c. 463, § 1 ............................................................................................ 8

Other Authorities

https://en.wikipedia.org/wiki/G20 ........................................................................ 27

https://tfm.fiscal.treasury.gov/v2/p6/c300.pd ...................................................... 54

https://www.cnbc.com/2019/01/09/trump-prime-time-sales-pitch-for-border-wall-didnt-change-
    anything-in-shutdown-fight.htm ...................................................................... 3

https://www.treasury.gov/about/education/Pages/Freedman%27s-Bank%27sDemise.aspx........ 50

https://www.usnews.com/news/best-states/rankings ............................................... 7

Vattel, Emer de. The Law of Nations (Natural Law and Enlightenment Classics) ...................... 7

Treatises

11A WRIGHT &MILLER, FED. PRAC. &PROC. § 2948.1 (2d ed. 2004)................................. 6

MAY IT PLEASE THE COURT:

**I.**  INTRODUCTION

NOW COMES and appears the CHRISTIAN EMPEROR, Edward Moses Jr, Trust Protector of the American-l'iberian Indian Tribe of מֹשֶׁה Moses also known as the Atakapa Indian de Creole Nation who seeks an "EMERGENCY TEMPORARY RESTRAINING ORDER" without notice to the adverse parties, a declaratory judgment, preliminary and permanent injunction restraining and enjoining the United States Government, the State of Louisiana and its parishes, subdivisions, and municipalities from among other things past and future application of its sadistic "European Doctrine of Title by Discovery and Doctrine by Conquest." The Plaintiffs filed this class action lawsuit, seeking to be declared owners of certain immovable property and to fix the boundary between their properties and State-owned property. The Plaintiffs further requests compensation for the inverse condemnation of the immovable property and repayment

of royalties received by the State for oil, gas, and mineral activities that have taken place on the property.

a.   CLASS ACTION- Prerequisites.

Two requirements for exercise of pendent jurisdiction are: (1) that the federal claim has "substance" so as to confer jurisdiction of subject matter on court in which action is commenced and (2) that the state and federal claims derive from a common nucleus of operative fact. Lewis v. Pennington, 400 F.2d 806 (6th Cir.1968) The Plaintiffs filed this class action lawsuit, seeking a declaration that the class owns riparian property located next to Bayou Teche, Mermentau River, Atchafalaya River and the Mississippi River to the Gulf of Mexico together with any unidentified navigable water ways.[1] To establish ownership and possession of the aforementioned properties and waterways plaintiff cites to Article V of the Treaty of Friendship, Limits, and Navigation Between Spain and The United States; October 27, 1795 which states as follows:

> The two High contracting Parties shall by all the means in their power maintain peace and harmony among the several Indian Nations who inhabit the country adjacent to the lines and Rivers which by the proceeding Articles form the boundaries of the two Floridas…

The Plaintiff seek a declaration that they owners of the Acadiana territory former known as Atakapa County, Orleans Territory and the Post Des Atakapa Trading Post and to fix the boundary between their properties and State-owned property.[2] The Plaintiffs further seek compensation for the inverse condemnation of their immovable property and repayment of royalties received by the State and federal Government for oil, gas, and mineral activities that have taken place on the property.[3]  Petitioner seeks a declaratory judgment declaring the class

---

[1] Crooks v. Dep't of Nat. Res., 2017-750 (La.App. 3 Cir. 12/28/18) 2018 WL 6816853

[2] id
[3] id

7

owners of all lands known as Atakapa or Post des Atakapa, New Spain or Spanish Louisiana, East and West Florida accordance with Louisiana's laws of riparian ownership....[4] Plaintiffs assert additional claims seeking a declaration that their lands have been unlawfully expropriated, without compensation due to unlawful occupation and taking.

Petitioners seek damages for the unlawful taking of their land by unlawful occupation; and to recover the mineral royalty and other payments derived from oil, gas, and mineral activities and productions received by the State of Louisiana and the United States from the immovable property that is the subject of these proceedings. Separate and independent from the above, Plaintiffs consists [sic] of the owners of "Post des Atakapa" located on the Bayou near Jeanerette. Much of the land bordering and lying outside modern-day Old Jeanerette Road in New Iberia was selected and approved as fertile farm land and transferred to the state by the United States Government under the Morrill Land-Grant Act of 1862, granting lands to establish Land Grant Colleges. It is not disputed that these lands and their titles originated from patents issued by the [S]tate and Federal Government.  Because of the State's and federal government's acknowledgment that these plaintiffs' ownership is not disputed, the only remaining issues with respect to these owners is whether lands known as New Spain or Spanish Louisiana have been unlawfully expropriated and, if so, the amount of damages necessary to compensate these plaintiffs for the unlawful taking of their land without compensation.

b.  There are questions of law or fact common to the class;

1.  Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

---

[4] id

2.  All natural and legal persons of indigenous negroid descendant who inhabited the country adjacent to the lines and Rivers which form the boundaries of East and West Florida and Atakapa District.

3.  Specifically excluded from this Class are Defendants of European or Anglo Saxon Descent; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir or assign of any Defendant and any person acting on their behalf.

4.  Class Identity: The Plaintiff Class is readily identifiable and is one for which records should exist.

5.  Numerosity: Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands of Class members as above described, the exact number and their identities being known or readily ascertainable to Defendants and their co-conspirators.

6.  Typicality: Plaintiff's claims are typical of the claims of the members of the Plaintiff Class because plaintiff was granted through intestate succession ownership of Family birthrights, specifically their identity as descendants of the Atakapa Indian Nation residential owners of Atakapa District and Post Des Atakapa Commercial Trading Post therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

7.  Common questions predominate: There are questions of law and fact common to the Class, including, but not limited to:

    a)  whether Defendants and their co-conspirators unlawfully expropriated plaintiff's property without just compensation;

    b)  whether Defendants and their co-conspirators secured secret interest in oil and gas lease granted in Atakapa Indian's lands;

    c)     the identity of the participants of the alleged conspiracy or manipulative scheme;

    d)     the duration of the conspiracy or manipulative scheme alleged herein and the acts performed by Defendants and their co-conspirators in furtherance thereof;

    e)     whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1 et seq;

    f)     whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and the other members of the Plaintiff Class;

    g)     the appropriate class-wide measure of damages; and

    h)     the appropriate nature of class-wide injunctive or other equitable relief.

8. These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

9. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. Plaintiff has retained counsel competent and experienced in the litigation of class actions and antitrust litigation to represent itself and the Class.

10. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for

inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

This case raises the single question whether territory acquired by the United States by cession from a foreign power remains a 'foreign country'….[5]  The United States Federal government was created in 1777 by the union of thirteen anglo-saxon colonies of Great Britain in 'certain articles of confederation and perpetual union….' Each member of the confederacy was denominated a state.[6]

### c.    The Doctrine of Title by Discovery and Doctrine of Conquest

The illegal coercive provisions of the Doctrine of Conquest can find its roots in the 1795 Treaty of Friendship between the Catholic King of Spain and the United States Paragraph V to wit:

> "both Parties oblige themselves expressly to restrain by force all hostilities on the part of the Indian Nations living within their boundaries

Louisiana is the only state that governs under Roman Civil Law.  Under Roman law it was declared that 'a promise made to effect a base purpose, as to commit homicide or sacrilege, is not binding.'[7] In United States jurisprudence a contract may be illegal and void because it is contrary to a constitution or statute, or inconsistent with sound policy and good morals.[8] Lord Mansfield said: 'Many contracts which are not against morality, are still void as being against the maxims of sound policy.'[9] It is a rule of the common law of universal application, that where a contract express or implied is tainted with either of the vices last named, as to the consideration

---

[5] <u>De Lima v. Bidwell</u>, 182 U.S. 1, 174, 21 S.Ct. 743, 45 L.Ed. 1041 (1901)
[6] <u>Downes v. Bidwell</u>, 182 U.S. 244, 249, 21 S.Ct. 770, 772, 45 L.Ed. 1088 (1901)
[7] <u>Trist v. Child</u>, 88 U.S. 441, 448, 22 L.Ed. 623 (1874)
[8] id
[9] id

or the thing to be done, no alleged right founded upon it can be enforced in a court of justice. [10] The system under which the United States were settled seems to have been that of converting the discovery of the country into conquest.[11] The property of the great mass of the community originates in this principle which cannot be rejected by courts of justice. [12]

When the conquest is complete, and the conquered inhabitants can be blended with the conquerors, or safely governed as a distinct people, public opinion, which not even the conqueror can disregard, imposes these restraints upon him; and he cannot neglect them without injury to his fame, and hazard to his power.[13] Most usually, the conquered are incorporated with the victorious nation, and become subjects or citizens of the government with which they are connected. The new and old members of the society mingle with each other; the distinction between them is gradually lost, and they make one people.[14] Where this incorporation is practicable, humanity demands, and a wise policy requires, that the rights of the conquered to property should remain unimpaired; that the new subjects should be governed as equitably as the old, and that confidence in their security should gradually banish the painful sense of being separated from their ancient connections and united by force to strangers.[15]

It is more likely than not that individuals' human rights are being violated by the sadistic European Doctrine of Conquest by force, and the loss of their Human rights, even for a minimal period, constitutes irreparable harm.[16]  Showing that plaintiff was harmed or threatened with harm by alleged antitrust practice of defendant is prerequisite to private antitrust action seeking treble damages or injunctive relief under Clayton Act. Clayton Act, §§ 4, 16, 15 U.S.C.A. §§ 15, 26.  Before a district court may issue a preliminary injunction, the movant must show that: (1)

---

[10] id
[11] Johnson v. M'Intosh, 21 U.S. 543, 562, 5 L.Ed. 681 (1823)
[12] id
[13] id
[14] id
[15] id
[16] Mills v. D.C., 571 F.3d 1304 (D.C. Cir.2009)

the movant is likely to suffer irreparable injury unless the injunction issues; (2) the threatened injury to the movant if the court does not issue the preliminary injunction outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits.[17][18] A plaintiff seeking injunctive relief "must satisfy the court that relief is needed."[19] To meet this standard, a plaintiff must demonstrate "that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."[20][21]

Under this test, petitioner must show that he is likely to suffer irreparable injury unless the injunction issues.  A private company, the Royal Crown, LTD brought this antitrust action against the United States, the Louisiana Governor through the Governor's office of Indian Affairs and through the corporate body of the Council for the Success of Black men and Boys, the Parish of East Baton Rouge, Iberia, St. Martin, Orleans, Shreveport and Monroe, subdivisions of the State of Louisiana, and local officials, in their official capacity as Mayors of the several parishes among other defendants.[22] His Majesty relies on Jefferson Disposal Co., Inc. v. Jefferson Parish, La., for the proposition (suggesting that persons who were injured by anticompetitive conduct of a local government retained rights to injunctive relief under Section 16 of the Clayton Act).[23][24]

---

[17] Fed. R. Civ. P. 65
[18] People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd., CIV 16-0611 JB\SCY, 2018 WL 5437832 (D.N.M. Oct. 29, 2018)
[19] United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).
[20] Id. at 633
[21] Walker v. Turner, 4:18CV48-GHD-DAS, 2018 WL 3868790, at *2 (N.D. Miss. Aug. 14, 2018)
[22] Jefferson Disposal Co., Inc. v. Jefferson Par., La., 603 F.Supp. 1125 (E.D. La.1985)
[23] id
[24] See H.K. Porter Company v. Metropolitan Dade County, 650 F.2d 778 (5th Cir.1981); Save the Bay, Inc. v. The United States Army, 639 F.2d 1100 (5th Cir.1981).

The Supreme Court in National Society of Professional Engineers v. United States instructed that a district court is empowered to fashion appropriate restraints on a defendant's future activities "both to avoid a recurrence of the violation and to eliminate its consequences."[25] Thus, so long as the injunctive relief is "a reasonable method of eliminating the consequences of the illegal conduct," it may be rendered. Id. In the instant case, the availability of injunctive relief is of major importance; it provides the ROYAL CROWN with the opportunity to challenge the legality of the United States, State of Louisiana and the Parishes along with the named and unnamed corporate defendants monopolistic, anti-competitive activity and, if successful in proving a violation of the antitrust laws, to have the Court correct the process for the future.[26]

**II.** they will continue to suffer irreparable injury if a temporary restraining order and a preliminary and permanent injunction is not granted

The ROYAL CROWN, LTD will continue to suffer irreparable injury if the emergency restraining order, preliminary and permanent injunctions are not issued in this case. Separation from land and from ancient ancestral connections causes Immediate, Ongoing, Irreparable Harm "[L]oss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. [27]As a result, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."[28] The threat of separation and any actual separation causes immediate, ongoing, severe trauma to Plaintiffs, as would any period of forced separation, for which no remedy at law is available.[29]

---

[25] National Society of Professional Engineers v. United States 435 U.S. at 697, 98 S.Ct. at 1368 (citations omitted).
[26] Jefferson Disposal Co., Inc. v. Jefferson Par., La., 603 F.Supp. 1125, 1133–34 (E.D. La.1985)
[27] Mills v. Dist. of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citations omitted).
[28] 11A WRIGHT &MILLER, FED. PRAC. &PROC. § 2948.1 (2d ed. 2004).
[29] M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 121-23 (D.D.C. 2018).

**1.** 8 U.S.C.A. <u>§ 1401. Nationals and citizens of United States at birth</u>

The following shall be nationals and citizens of the United States at birth:

**(a)**       a person born in the United States, and subject to the jurisdiction thereof.

**(b)**       a person born in the United States to a member of <u>an … aboriginal tribe</u>: Provided, <u>That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property</u>;

The Atakapa Indians of New Iberia was granted United States citizenship status as "African Americans" and as Louisiana Citizens recently under the corporate body of the council for the success of "Black Men and Boys" but their status as United States and Louisiana citizens "impairs and deprives [them] from exercising their birth rights to their domestic and international tribal lands and other property.

**2.** <u>Declaratory relief as to citizenship. Tribal Allegiance vs the 14th Amendment</u>

An action for a declaratory judgment as to citizenship involves a trial de novo. The fourteenth amendment affirms the ancient rule of citizenship by birth within the territory in the allegiance and under the protection of the country, including all children here born of resident aliens, except the children of foreign sovereigns or their ministers, or born on foreign public ships, or children of Indian tribes owing direct tribal allegiance.[30] On November 9, 2017, the District Court in Iberia Parish granted petitioners a judgment of possession to reclaim their tribal titles and names as part of the intestate succession of WILLIAM MOSES JR.  In accordance with the judgment of possession petitioner is a descendant of [sic] the Atakapa-Ishak Indian Nation of the former Spanish Louisiana Territory at Post des Atakapa renamed Acadiana.

In 1971, the Louisiana State Legislature officially recognized twenty-two Louisiana parishes and "other parishes of similar cultural environment" for their "strong French Acadian

---

[30] <u>United States v. Wong Kim Ark</u>, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898)

cultural aspects" (House Concurrent Resolution No. 496, June 6, 1971, authored by Carl W. Bauer of St. Mary Parish), and made *The Heart of Acadiana* the official name of the region. The public, however, prefers the one-word place name *Acadiana* to refer to the region. The official term appears on regional maps and highway markers. [31]

**3.** Guardian and Ward

It is common knowledge that in the United States, until recent years, there were many localities that did not maintain comprehensive and complete vital statistics or birth records, and that even in those metropolitan centers in which such records were maintained some have been lost or destroyed accidentally, either by fire or flood or other casualties. [32] The Atakapa Indian Nation of New Iberia "are being held as wards of the State through the Louisiana Governor's Office of Indian Affairs, and through the corporate body of the Council for the Success of Black Men and Boys ... [a]nd in pupilage under [the] United States[.]"[33]

The legal relationship that exists between a person (the guardian) appointed by a court <u>to take care of and manage the property of a person</u> (the ward) who does not possess the legal capacity to do so, by reason of age, comprehension, or self-control.  In 1812 the State of Louisiana through the United States assumed a fiduciary relationship with the ancient indigenous Aboriginal occupants specifically the Atakapa Indian Nation of East and West Florida[34] and the vast Louisiana Territory, New Spain or New Iberia named after the Iberian Peninsula.… In some of the old states 'where small remnants of tribes, American negro people of color, remain,

---

[31] https://en.wikipedia.org/wiki/Acadiana#cite_note-6
[32] <u>Liacakos v. Kennedy</u>, 195 F.Supp. 630 (D.D.C1961)
[33] <u>Atakapa Indian de Creole Nation v. Louisiana</u>, 6:18-CV-00190, 2018 WL 4222830, at *1 (W.D. La. July 23, 2018), <u>report and recommendation adopted,</u> 6:18-CV-00190, 2018 WL 4089385 (W.D. La. Aug. 27, 2018)
[34] La. Rev. Stat. Ann. § 25:701That portion of Louisiana east of the Mississippi River and north of the Isle of Orleans, which was part of the British Colony of West Florida until 1779, the Spanish Colony of West Florida until 1810, and finally the Republic of West Florida in late 1810, is an official region of the state of Louisiana. This unique region, which has national and international significance, shall be known as the Republic of West Florida Historic Region, or the Florida Parishes of Louisiana. The region shall include the parishes of East Baton Rouge, East Feliciana, Livingston, St. Helena, St. Tammany, Tangipahoa, Washington, and West Feliciana.

surrounded by white population, and who, by their reduced numbers, had lost the power of self-government, the laws of the state have been extended over them <u>for the protection of their persons and property</u>.'[35][36]

### 4. <u>Law of Trusts</u>

Equity will construct a trust in order to satisfy the demands of justice when one who occupies a fiduciary or confidential relationship abuses it and by fraud or overreaching gains some advantage to himself.[37] Moreover, the courts will prevent one from holding for his own benefit that which he has gained by reason of a breach of a fiduciary relationship.[38]  An administrator is not permitted to purchase directly or indirectly property belonging to the estate.[39] Moreover, the plaintiffs placed confidence in the United States and the State of Louisiana and expected and had a right to expect that they were telling them the truth and advising them promptly of all matters pertinent to the estate. The United States and the state of Louisiana owed to the plaintiffs the highest degree of fidelity. [40]

### 5. <u>United States and State of Louisiana Breach of Fiduciary Duty</u>

Traditional trust law provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty. In addition to specific remedies for recovery of profits obtained by fiduciaries by use of assets, trust law provides the alternative remedy of restoring participants to the position in which they would have occupied but for the breach of trust. Restatement (Second) of Trusts, s 205, Comment a.  Generally, in the absence of an election of a particular remedy by all beneficiaries, the court has a duty to enforce the remedy which is most advantageous to the participants and most conducive to effectuating the purposes of the trust.

---

[35] *Danzell* v. *Webquish*, 108 Mass. 133; *Pells* v. *Webquish*, 129 Mass. 469; Mass. St. 1862, *c.* 184; 1869, *c.* 463
[36] <u>Elk v. Wilkins</u>, 112 U.S. 94, 108, 5 S.Ct. 41, 48, 28 L.Ed. 643 (1884)
[37] <u>Strates v. Dimotsis</u>, 110 F.2d 374 (5th Cir.1940)
[38] id
[39] <u>id</u>
[40] id

Restatement (Second) of Trusts, s 214. Among the factors which the court may consider in selecting a remedy are: (1) the purposes of the trust; (2) the relative pecuniary advantages to the trust estate of the various remedies; (3) the nature of the interest of each beneficiary; (4) the practical availability of the various remedies; and (5) the extent of the deviation from the terms of the trust required by the adoption of each of the remedies.[41][42]

The Broad definition of "fiduciary" under non-bankruptcy law, namely, a relationship involving trust, confidence, and good faith, … under federal law arises by virtue of an express … trust. 11 U.S.C.A. § 523(a)(4).[43]  Courts use the common law of trusts as a guide to interpreting fiduciary duties … and stating an affirmative defense of acquiescence or consent to a breach of trust complaint under common law requires full disclosure of material facts.[44] ("For a cestui que trust to 'ratify' or confirm a breach of trust, he must be apprised of all the material facts and as well of their legal effect. Johnson v. M'Intosh stands for the proposition that the illegal title to American land allegedly held by the United States government acquired by discovery and conquest is superior to that of the American aborigine's succession rights.[45]

Does this term designate the whole, or any particular portion of the American empire? Certainly, this question can admit but of one answer. There are certain principles of natural justice inherent in the Anglo-Saxon character, which need no expression in constitutions or statutes to give them effect or to secure dependencies against legislation manifestly hostile to their real interests.[46] No half-hearted disclosure or partial discovery is sufficient in either respect.");[47] [48] ("The mere fact ... that the beneficiary does not object to a deviation from the

---

[41] Restatement (Second) of Trusts, s 214 Comment to Subsection (2, b)
[42] Eaves v. Penn, 587 F.2d 453, 462–63 (10th Cir.197
[43] In re McPherson, 564 B.R. 6 (Bankr. D. Mass.2017)
[44] See Ream v. Frey, 107 F.3d 147, 153-54 (3d Cir. 1997); In re Cumberland Farms, Inc., 284 F.3d 216, 231 (1st Cir. 2002)
[45] Johnson v. M'Intosh, 21 U.S. 543, 562, 5 L.Ed. 681 (1823)
[46] Downes v. Bidwell, 182 U.S. 244, 280, 21 S.Ct. 770, 784, 45 L.Ed. 1088 (1901)
[47] Restatement (Second) of Trusts § 216 (1959)

terms of the trust is not consent to such deviation."). id.   Proceeding to decide the case upon the merits, Chief Justice Marshall held that the territorial clause of the Constitution was confined to the territory which belonged to the United States at the time the Constitution was adopted and did not apply to territory subsequently acquired from a foreign government. [49]   In <u>Downes v. Bidwell</u> The United States Supreme Court held that the Island of Porto Rico by the treaty of cession with Spain became territory appurtenant to the United States, but not a part of the United States."[50]

### **6.** <u>The Doctrine of Discovery vs The Sadistic Doctrine of European Conquest</u>

The Question thus raised by his Majesty here is whether the Louisiana Territory acquired by the United States from France by cessation actually belong to the United States or does it belong to the Christian Emperor D'Orleans by intestate succession? The French Louisiana Territory was an independent sovereign country at the time that the constitution was adopted. Furthermore, the Louisiana Purchase treaty was not ratified by the United States congress. Following the logic of Chief Justice Marshall's holding in <u>Downes v. Bidwell</u> the Louisiana territory or New Spain <u>does not</u> belong to the United States in any capacity because the Treaty with France was never ratified by the United States Congress and thus it is not subject to the confines of the United States Constitution, but that of international law and the Law of Nations. And although the Spanish Treaty of 1795 was ratified by the United States Congress and Spain it is void because it contains an illegal provision to "use Force" against the inhabitants and outright owners by succession of the Louisiana Territory.

To establish a violation of the Sherman Act under provision making illegal every contract, combination, or conspiracy in restraint of trade, plaintiffs must show that the defendants

---

[48] <u>Huffman v. Prudential Ins. Co. of Am.</u>, 2:10-CV-05135, 2017 WL 6055225, at (E.D. Pa. Dec. 7, 2017)
[49] <u>Downes v. Bidwell</u>, 182 U.S. 244, 280, 21 S.Ct. 770, 784, 45 L.Ed. 1088 (1901)
[50] Id

(1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant

market.[51] Plaintiff shows this court through relevant facts gleaned from the seminal cases on the

doctrine of discovery and doctrine of Conquest that the defendant's engaged in a conspiracy that

produced anti-competitive effect in a relevant market, real estate.

a)      America, the New World, separated from Europe by a wide ocean, was inhabited by a distinct people, divided into separate nations, independent of each other and of the rest of the world, having institutions of their own, and governing themselves by their own laws. Worcester v. State of Ga., 31 U.S. 515, 542–43, 8 L.Ed. 483 (1832)

b)      American: n. A native of America originally applied to the aboriginals or copper-colored races, found here by Europeans.  American Dictionary of English Language, Webster, Noah 1828 Vol 1 pg 12

c)      The American Race - is marked by a brown complexion, long. black, lank hair, and deficient beard.  The eyes are black and deep set, the brow low, the cheek-bones high, the nose large and aquiline, the mouth large, and the lips tumid and compressed.  The skull is small, wide between the parietal protuberance, prominent at the vertex, and flat on the Occiput.  Samuel George Morton, Crania Americana; or a comparative view of the skulls of various Aboriginal Nations of North and South America pg. 6 (1839)

---

[51] Teladoc, Inc. v. Texas Med. Bd., 112 F.Supp.3d 529 (W.D. Tex.2015)

 

American Iberian Original                              Assimilated Negro

Above: Papa Tom (Thomas) Moses Grandfather of William Moses Jr

d)      Soon after Great Britain determined on planting colonies in America, the king granted charters to companies of his subjects, who associated for the purpose of carrying the views of the crown into effect, and of enriching themselves. The first of these charters was made before possession was taken of any part of the country. Worcester v. State of Ga., 31 U.S. 515, 517, 8 L.Ed. 483 (1832)

e)      They purport generally to convey the soil, from the Atlantic to the South Sea. This soil was occupied by numerous and warlike nations, equally willing and able to defend their possessions. Worcester v. State of Ga., 31 U.S. 515, 517, 8 L.Ed. 483 (1832)

f)      The extravagant and absurd idea, that the feeble settlements made on the sea coast, or the companies under whom they were made, acquired legitimate power by them to govern the people, or occupy the lands from sea to sea, did not enter the mind of any man. id

g)      They were well understood to convey the title which, according to the common law of European sovereigns respecting America, they might rightfully convey, and no more. Worcester v. State of Ga., 31 U.S. 515, 517, 8 L.Ed. 483 (1832)

21

h)      This was the exclusive right of purchasing such lands as the natives were willing to sell. The crown could not be understood to grant what the crown did not affect to claim, nor was it so understood. id

i)      Certain it is, that our history furnishes no example, from the first settlement of this country, of any attempt, on the part of the crown, to interfere with the internal affairs of the Indians, farther than to keep out the agents of foreign powers, who, as traders or otherwise, might seduce them into foreign alliances. id

j)      The king purchased their lands when they were willing to sell, at a price they were willing to take; but never coerced a surrender of them. He also purchased their alliance and dependence by subsidies; but never intruded into the interior of their affairs, or interfered with their self-government, so far as respected themselves only. Worcester v. State of Ga., 31 U.S. 515, 517, 8 L.Ed. 483 (1832)

k)      It is difficult to comprehend the proposition, that the inhabitants of either quarter of the globe could have rightful original claims of dominion over the inhabitants of the other, or over the lands they occupied; or that the discovery of either by the other should give the discoverer rights in the country discovered, which annulled the pre-existing rights of its ancient possessors. Worcester v. State of Ga., 31 U.S. 515, 542–43, 8 L.Ed. 483 (1832)

l)      After lying concealed for a series of ages, the enterprise of Europe, guided by nautical science obtained from moors, conducted some of her adventurous sons into this western world. They found it in possession of a people who had made small progress in agriculture or manufactures, and whose general employment was war, hunting, and fishing. Worcester v. State of Ga., 31 U.S. 515, 543, 8 L.Ed. 483 (1832)

m)      The great maritime powers of Europe discovered and visited different parts of this continent at nearly the same time. id

n)      The object was too immense for any one of them to grasp the whole; and the claimants were too powerful to submit to the exclusive or unreasonable pretensions of any single potentate. id

o)      To avoid bloody conflicts, which might terminate disastrously to all, it was necessary for the nations of Europe to establish some principle which all would acknowledge, and which should decide their respective rights as between themselves. Id

p)      This principle, suggested by the actual state of things, was, 'that discovery gave title to the government by whose subjects or by whose authority it was made, against all other European governments, which title might be consummated by possession.' Worcester v. State of Ga., 31 U.S. 515, 543–44, 8 L.Ed. 483 (1832)

q)      This principle, acknowledged by all Europeans, because it was the interest of all to acknowledge it, gave to the nation making the discovery, as its inevitable consequence, the sole right of acquiring the soil and of making settlements on it. Worcester v. State of Ga., 31 U.S. 515, 544, 8 L.Ed. 483 (1832)

r)      It was an exclusive principle which shut out the right of competition among those who had agreed to it; not one which could annul the previous rights of those who had not agreed to it. Worcester v. State of Ga., 31 U.S. 515, 544, 8 L.Ed. 483 (1832)

s)      It regulated the right given by discovery among the European discoverers; but could not affect the rights of those already in possession, either as aboriginal occupants, or as occupants by virtue of a discovery made before the memory of man. Worcester v. State of Ga., 31 U.S. 515, 544, 8 L.Ed. 483 (1832)

t)      It gave the exclusive right to purchase but did not found that right on a denial of the right of the possessor to sell. Worcester v. State of Ga., 31 U.S. 515, 544, 8 L.Ed. 483 (1832)

u)      The settled doctrine of the law of nations is, that a weaker power does not surrender its independence—its right to self-government, by associating with a stronger power, and taking its protection. Worcester v. State of Ga., 31 U.S. 515, 520, 8 L.Ed. 483 (1832)

v)      A weak state, in order to provide for its safety, may place itself under the protection of one more powerful, without stripping itself of the right of government, and ceasing to be a state. Worcester v. State of Ga., 31 U.S. 515, 520, 8 L.Ed. 483 (1832)

w)      Examples of this kind are not wanting in Europe. 'Tributary and feudatory states,' says Vattel, 'do not thereby cease to be sovereign and independent states, so long as self-government and sovereign and independent authority are left in the administration of the state.'id

x)      At the present day, more than one state may be considered as holding its right of self-government under the guarantee and protection of one or more allies. Worcester v. State of Ga., 31 U.S. 515, 520, 8 L.Ed. 483 (1832)

y)      Did these adventurers, by sailing along the coast, and occasionally landing on it, acquire for the several governments to whom they belonged, or by whom they were commissioned, a rightful property in the soil, from the Atlantic to the Pacific; or rightful dominion over the numerous people who occupied it?

z)      Or has nature, or the great Creator of all things, conferred these rights over hunters and fishermen, on agriculturists and manufacturers? Worcester v. State of Ga., 31 U.S. 515, 543, 8 L.Ed. 483 (1832)

aa)     In his Notes on the State of Virginia, Thomas Jefferson referred to the detrimental effect on the Aboriginal occupants of spirituous liquors, pox, and diminution of available land to "a people who live principally on the spontaneous productions of nature. Coleman v. U.S. Bureau of Indian Affairs, 715 F.2d 1156, 1157 (7th Cir.1983)

bb)      Jefferson noted, "That the lands of this country were taken from them by conquest…. Coleman v. U.S. Bureau of Indian Affairs, 715 F.2d 1156, 1157 (7th Cir.1983)

cc)     The Constitution framed in 1787 at Philadelphia empowered the federal government to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes (negro, Free people of Color). Coleman v. U.S. Bureau of Indian Affairs, 715 F.2d 1156, 1157 (7th Cir.1983)

23

dd)    "That instrument confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and with the Indian tribes. These powers comprehend all that is required for the regulation of European and United States Government intercourse with the Aboriginal occupants." <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1157–58 (7th Cir.1983)

ee)    The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the Union. <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

ff)    Hence, State Governments like Georgia could not constitutionally subject American negroid free people of color to imprisonment … under the authority of the President of the United States. <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

gg)    This decision was the occasion for the remark allegedly made by President Andrew Jackson: "Well, John Marshall has made his decision, now let him enforce it <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

hh)    In this case Marshall applied the doctrine of title by discovery, giving to the European nation first settling an American colony the right of pre-emption, "the exclusive right of purchasing such lands as the aboriginal occupants were willing to sell."[9] <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

ii)    This principle had been formulated in Johnson and Graham's Lessee v. McIntosh, 8 Wheat. 543, 574, 5 L.Ed. 681 (1823), where it was held that a title granted by Indian tribes themselves in 1773 and 1775, without the intervention of the United States government, was invalid. <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

jj)    The court held that the Aboriginal occupants had a right to occupy the lands which they inhabited, "but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil, at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it." <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

kk)    The European nations "asserted the ultimate dominion to be in themselves and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in the possession of the Black Original occupants. <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

ll)    These grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy." <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

mm)    Insofar as the negro Aboriginal occupants were concerned, Marshall explains: "The potentates of the old world found no difficulty in convincing themselves, that they made ample compensation to the Black inhabitants of the new, by bestowing on them Civilization and Christianity, in exchange for unlimited independence."[11] <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1158 (7th Cir.1983)

nn)    The 1795 Spanish Treaty of Friendship acknowledges the Atakapa to be a Sovereign and independent Superpower capable of domestic and international commerce with both the United States and Spain. By the language of the Spanish treaty, the Atakapa Indians are business partners with Spain and the United States at Post d'Atakapa.

oo)    By a secret treaty, which was executed about the same time, France ceded Louisiana to Spain; and Spain has since retroceded the same country to France. At the time both of its cession and retrocession, it was occupied, chiefly, by the Original American negroid People. Johnson v. M'Intosh, 21 U.S. 543, 584, 5 L.Ed. 681 (1823)

pp)    A contract cannot be altered by one of the parties to it. Dougherty v. United States, 5 Ct.Cl. 108, 113 (1869)

qq)    The United States did not purchase Louisiana from its original Black negro inhabitants. The alleged purchase of Louisiana was the purchase from France of a country almost entirely occupied by numerous tribes of aboriginal Indians, who are in fact independent. Yet, any attempt of others to intrude into that country, would be considered as an aggression which would justify war. Johnson v. M'Intosh, 21 U.S. 543, 587, 5 L.Ed. 681 (1823)

rr)    Conquest gives a title which the Courts of the conqueror cannot deny, whatever the private and speculative opinions of individuals may be, respecting the original justice of the claim which has been successfully asserted. Johnson v. M'Intosh, 21 U.S. 543, 588–89, 5 L.Ed. 681 (1823)

ss)    The British Empire, which was then the United States government, and whose rights have passed to the United States, asserted title to all the lands occupied by Indians, within the chartered limits of the British colonies. It asserted also a limited sovereignty over them, and the exclusive right of extinguishing the title which occupancy gave to them. Johnson v. M'Intosh, 21 U.S. 543, 588–89, 5 L.Ed. 681 (1823)

tt)    These claims have been maintained and established as far west as the river Mississippi, by the sword. The title to a vast portion of the lands we now hold, originates in them. It is not for the Courts of this country to question the validity of this title, or to sustain one which is incompatible with it. Johnson v. M'Intosh, 21 U.S. 543, 588–89, 5 L.Ed. 681 (1823)

uu)    Although we do not mean to engage in the defense of those principles which Europeans have applied to Aboriginal Indian title, they may, we think, find some excuse, if not justification, in the character and habits of the people whose rights have been wrested from them. Johnson v. M'Intosh, 21 U.S. 543, 588–89, 5 L.Ed. 681 (1823)

vv)    The title by conquest is acquired and maintained by force. The conqueror prescribes its limits. Humanity, however, acting on public opinion, has established, as a general rule, that the conquered shall not be wantonly oppressed, and that their condition shall remain as eligible as is compatible with the objects of the conquest. Johnson v. M'Intosh, 21 U.S. 543, 588–89, 5 L.Ed. 681 (1823)

ww)    When the conquest is complete, and the conquered inhabitants can be blended with the conquerors, or safely governed as a distinct people, public opinion, which not even the conqueror

can disregard, imposes these restraints upon him; and he cannot neglect them without injury to his fame, and hazard to his power. <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 589–90, 5 L.Ed. 681 (1823)

xx)    Most usually, the conquered are incorporated with the victorious nation, and become subjects or citizens of the government with which they are connected. The new and old members of the society mingle with each other; the distinction between them is gradually lost, and they make one people. <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 588–89, 5 L.Ed. 681 (1823)

yy)    But the tribes of Indians inhabiting this country were fierce savages, whose occupation was war, and whose subsistence was drawn chiefly from the forest. To leave them in possession of their country, was to leave the country a wilderness; to govern them as a distinct people, was impossible, because they were as brave and as high spirited as they were fierce and were ready to repel by arms every attempt on their independence. <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 590, 5 L.Ed. 681 (1823)

zz)    What was the inevitable consequence of this state of things? The Europeans are under the necessity either of abandoning this country, and relinquishing their pompous claims to it, or of enforcing their claims by the sword, and by the adoption of principles adapted to the condition of a people with whom it was impossible to mix, and who could not be governed as a distinct society, or of remaining in their neighborhood. <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 590, 5 L.Ed. 681 (1823)

aaa)    A policy of assimilation, rather than of preservation of ethnic heritage and tribal customs, came to the fore. As expressed in 1889 by Indian Commissioner Thomas J. Morgan: "The <u>Indians, people of color, must conform</u> to 'the white man's way,' <u>peaceably if they will, forcibly if they must</u>. <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1159 (7th Cir.1983

bbb)    They must adjust themselves to their environment and conform their mode of living substantially to our civilization.... They cannot escape it, and must either conform to it or <u>be crushed by it</u> ... The tribal relations should be broken up, socialism destroyed, and the family and the autonomy of the individual substituted. <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1159 (7th Cir.1983

ccc)    The allotment of lands in severalty, the establishment of local courts and police, the development of a personal sense of independence, and the universal adoption of the English language, are means to this end.... The American Indian is to become the Indian American." <u>Coleman v. U.S. Bureau of Indian Affairs</u>, 715 F.2d 1156, 1159 (7th Cir.1983)[52][53]

ddd)    Where this incorporation is practicable, humanity demands, and a wise policy requires, that the rights of the conquered to property should remain unimpaired; that the new subjects should be governed as equitably as the old, and that confidence in their security should gradually banish the painful sense of being separated from their ancient connexions, and united <u>by force</u> to strangers. <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 588–89, 5 L.Ed. 681 (1823)

The British European men who framed the Constitution, and the European Anglo Saxon people who adopted it, were unwilling to depend for their safety upon what, in the opinion referred to, is

---

[52] Apology to Indians, and misclassification as African American
[53] Apology for Slavery

described as 'certain principles of natural justice inherent in Anglo-Saxon character, which need no expression in constitutions or statutes to give them effect or to secure dependencies against legislation manifestly hostile to their real interests.'[54]

They proceeded upon the theory—the wisdom of which experience has vindicated—that the only safe guaranty against governmental oppression was to withhold or restrict the power to oppress.

They well remembered that Anglo-Saxons across the ocean had attempted, in defiance of law and justice, to trample upon the rights of Anglo-Saxons on this continent, and had sought, by military force, to establish a government that could at will destroy the privileges that inhere in liberty.[55]

They believed that the establishment here of a government that could administer public affairs according to its will, unrestrained by any fundamental law and without regard to the inherent rights of free men, would be ruinous to the liberties of the people by exposing them to the oppressions of arbitrary power.[56]

Applying these same principles to the case before this court, British European Anglo-Saxons from across the ocean in defiance of law and justice, trampled upon the succession rights of the American Aboriginal negro people on this continent, and by military force established an illegal police state that "at will" destroys the privileges and immunities that inhere in Royal Devine Sovereign Immunity.[57] Separation from ancient customs and property causes immediate, Ongoing, Irreparable Harm "[L]oss of constitutional Rights or Human Rights, for even minimal periods of time, unquestionably constitutes irreparable injury.[58] As a result, "[w]hen an alleged deprivation of a constitutional right or Human Rights is involved, most courts hold that no further showing of irreparable injury is necessary."[59] The threat of separation and any actual separation causes immediate, ongoing, severe trauma as would any period of forced separation, for which no remedy at law is available.

**7.** Right of Election to become citizens of the United States

---

[54] Downes v. Bidwell, 182 U.S. 244, 381–82, 21 S.Ct. 770, 823, 45 L.Ed. 1088 (1901)
[55] id
[56] id
[57] id
[58] Mills v. Dist. of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citations omitted).
[59] 11A WRIGHT &MILLER, FED. PRAC. &PROC. § 2948.1 (2d ed. 2004).

The Tobin v. Walkinshaw action was an ejectment, and defendants pleaded to the jurisdiction of the court, on the ground that Alexander Forbes, one of the defendants, was not an alien and subject of Great Britain, as alleged in the complaint.[60]  To sustain their plea, defendants relied on the admitted facts, that said Forbes, a native of Great Britain, was at the date of the treaty of Guadalupe Hidalgo February 2, 1848, a naturalized citizen of Mexico, that he has continued to reside in California since the execution of the treaty, and that he has never made any declaration of an intention to retain the rights of a Mexican citizen. id

The consideration of this argument involves, to some extent, a construction of the article of the treaty of Guadalupe Hidalgo, upon which it is predicated. id This article stipulates as to those Mexicans who should prefer to remain in the ceded territory, that they may either retain the title and rights of Mexican citizens, or acquire those of United States citizens; but declares that they shall be under the obligation to make their election, within one year from the date of the exchange of the ratification of the treaty, and those who shall remain after the expiration of that year, without having declared their intention to retain the character of Mexican citizens, shall be considered to have elected to become citizens of the United States.id

By a principle of international law, on a transfer of territory by one nation to another, the political relations between the inhabitants of the ceded country and the former government are changed, and new ones arise between them and the new government.[61] The contracting parties have the right to contract to transfer and to receive, respectively, the allegiance of all native-born citizens, but the naturalized citizens, who owe allegiance purely statutory, when released therefrom, are remitted to their original status.id in this case, the United States and Spain in the 1795 Spanish Treaty did not contract to transfer and to receive the allegiance of the indigenous-born Atakapa Indians of Post des Atakapa located in New Iberia. id Instead the parties contracted

---

[60] Tobin v. Walkinshaw, 23 F.Cas. 1346 (C.C.N.D. Cal.1856)
[61] Tobin v. Walkinshaw, 23 F.Cas. 1346 (C.C.N.D. Cal.1856)

to refrain from seeking allegiance of the Indian Nation and only enter into treaties of friendship with the Indian Nations located in Spanish Louisiana Territory. Id

This right to change the political relations of the inhabitants of a ceded territory arises out of the character of those relations as recognized by the law of nature and nations.id Birth binds man by the tie of natural allegiance to his native soil, and such allegiance gives, by the principles of universal law, to the country in which he was born rights unknown to mere voluntary or statutory allegiance.id Upon the right to transfer this natural allegiance has been engrafted, this right of election in the party whether he will retain his allegiance to his old sovereign, or pay allegiance to the new.id Should he elect to retain his allegiance, he must do so without injury to the new government; and such election is generally accompanied by removal from the country, unless regulated by treaty.id

**8.** <u>An Indigenous American of the Louisiana Territory is not a United States Citizen</u>

President Thomas Jefferson made this point clear in his message to Jean Baptist De Coinge wherein he stated as follows:

      i. <u>President Thomas Jefferson – message to Indian, Jean Baptist de Coigne</u>

We, like you, are <u>Americans</u>, born in the same land, and having the same interests.

Our forefathers were Englishmen, inhabitants of a little island beyond the great water, and, being distressed for land, they came and settled here.

Thomas Jefferson and all persons like him are British Anglo-saxons. President Thomas Jefferson could only be American if his family were indigenous born men of negroid heritage. President Thomas Jefferson and men like him hold the same position in America as Mr. Alexander Forbes did in <u>Tobin v. Walkinshaw</u> born in our land or not.

And by this court's own law should be naturalized Citizens of America or deported back to England or the region of their European or anglo-saxon heritage. The court considering the

anglo-saxon Europeans without the provisions of a treaty with the original people to be present in this land, his claim to be a citizen of the United States under one cannot be sustained; and he stood at the execution of the Spanish treaty, and now stands, where his acts and declarations and original status have placed him—an alien, and subject of Great Britain or the counrtry or territory of anglo-saxons.id

Mr. C.J. Ingersoll who introduced the resolution of annexation upon this subject said upon that occasion:

> "The stupendous deserts between the Nueces and the Bravo [the Rio Grande or Del Norte] rivers are the natural boundaries between the Anglo-Saxon and the Mauritanian races. There ends the valley of the west. There Mexico begins. Thence, beyond the Bravo, begin the Moorish people and their Indian associates, to whom Mexico properly belongs, who should not cross that vast desert if they could, as on our side we too ought to stop there, because interminable conflicts must ensue from either our going south or their coming north of that gigantic boundary. While peace is cherished, that boundary will be sacred. Not till the spirit oi conquest rages will the people on either side molest or mix with each other; and, whenever they do, one or the other race must be conquered, if not extinguished."[62]

**9.** <u>European invaders cannot impose its nationality on natural born residents of subjugated country without their consent.</u>

Under international law, inhabitants of territory transferred to new sovereign by conquest or cession become nationals of new government only by their own consent express or implicit.[63] The Christian Emperor D'Orleans Edward Moses Jr has not given his consent to become a national under the United States Government or the State of Louisiana. Thus, the United States cannot impose its nationality through the sadistic Doctrine of Conquest on the ROYAL CROWN, LTD.

---

[62] Mr. Stephens of Georgia, on the Subject of the **Mexican War**, Delivered in the House of Representatives, U.S. June 16, 1846 (pg. 13)

[63] <u>U.S. ex rel. Schwarzkopf v. Uhl</u>, 137 F.2d 898 (2d Cir.1943)

**10.** Conflict of interest exists between guardian and ward; appointment of Guardian ad litem is necessary

A conflict of interest in this case exists between the Anglo-Saxon United States and the Anglo-Saxon State of Louisiana government as guardian and the American Aboriginal, Atakapa Indian de Creole Nation as ward with regard to Aboriginal title of land which the Anglo-Saxon based US Courts claim is an equitable possessory interest, which is not superior to that possessed by the Anglo-Saxon United States, the alleged title holder.[64] While executor or administrator of an estate takes title to property of decedent, guardian of person of minor or other incompetent has no interest in his ward's property and guardian of his estate does not take legal title to the property, which remains in the ward, but merely acts as its custodian or manager.[65]   When conflict of interest exists between guardian and ward, the court is required to determine whether appointment of guardian ad litem is necessary to protect the interests of the ward even if incompetent already has a general representative, and where conflict of interest becomes apparent early in the litigation, appointment of guardian ad litem would be the customary and appropriate course.[66]

The conflict in this instance is apparent, the United States Anglo-Saxons as guardian of the Aboriginal Louisiana Indians, the United States allegedly purchased the vast Aboriginal ancestral lands from France and East and West Florida from Spain; but that's not the case, according to the United States Federal Judiciary the US Anglo-Saxons actually obtained possession of the Historic Louisiana Territory by conquest and is holding the Aboriginal lands and people by force.  But the Christian Emperor D'Orleans claims a vested right in New Spain or French Louisiana through intestate succession. His Majesty provided this court with a judgment of possession from the intestate succession of William Moses Jr wherein the descendants of

---

[64] Alabama-Coushatta Tribe of Texas v. United States, 757 F.3d 484 (5th Cir.2014)
[65] McSparran v. Weist, C.A.3 (Pa.) 1968, 402 F.2d 867, certiorari denied 89 S.Ct. 1739, 395 U.S. 903, 23 L.Ed.2d 217.
[66] Eagan by Keith v. Jackson, E.D.Pa.1994, 855 F.Supp. 765. Fed. R. Civ. P. 17VCCV

William Moses Jr obtained <u>vested rights in his family's tribal or other property</u> under 8 USCA 1401. Consequently, the Anglo-Saxon Europeans' sadistic doctrine of Conquest illegally affects his Majesty's enjoyment of family tribal names, lands, and property. [Rec Doc 1.3 pg 15-35] Thus, a conflict ensues. This court is required to determine whether appointment of guardian ad litem over the historic Louisiana territory is necessary to protect the interests of the Christian Emperor D'Orleans Edward Moses Jr. trust protector of the Tribe of מֹשֶׁה Moses also known as the Atakapa Indian de Creole Nation.

11. <u>U.S. Const. art. VI, cl. 2 Supreme Law of the Land specifically states</u>:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; <u>and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the Contrary notwithstanding.</u>

The United States ratified both the 1795 Spanish Treaty. and the 1800 French Treaty. Thus, both treaties were made under authority of the United States. Therefore, both treaties are the supreme law of the land; and the Judges in every State are bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.

12. <u>The French Convention of 1800 between the French Republic and the United States</u>:

> The Citizens, and <u>inhabitants</u> of the United States shall be at liberty to dispose by testament, donation, or otherwise, of their goods, moveable, and immoveable, holden in the territory of the French Republic in Europe, and the Citizens of the French Republic, shall have the same liberty with regard to goods, moveable, and immoveable, holden in the territory of the United States, in favor of such persons as they shall think proper.

> The Citizens and inhabitants of either of the two countries, who shall be heirs of goods, moveable, or immoveable in the other shall be able to succeed ab intestato, <u>without being obliged to obtain letters of naturalization</u>, and without having the effect of this provision contested or impeded under any pretext whatever: and <u>the said heirs, whether such by particular title, or ab intestato, shall be exempt from every duty whatever in both countries</u>….

The ultimate ending is that the Christian Emperor D' Orleans Edward Moses Jr, is an heir of the Royal Family of the Atakapa Indian Nation, the Tribe of מֹשֶׁה Moses ancient residents of New Iberia, La.   The Royal Family's inheritance is the Land formerly known as New Spain or New Iberia and a Domestic and International commercial business with the United States and with Spain respectively.   His Majesty possesses a vested right to claim his family inheritance and to recover his family's succession property without having the effect of this provision contested or impeded under any pretext whatever.

The Supreme Court in National Society of Professional Engineers v. United States instructed that a district court is empowered to fashion appropriate restraints on a defendant's future activities "both to avoid a recurrence of the violation and to eliminate its consequences."[67] Thus, so long as the injunctive relief is "a reasonable method of eliminating the consequences of the illegal conduct," it may be rendered. Id.   The beneficiaries make a special election to this court to appoint guardian ad litem over the historic Louisiana territory, New Spain or New Iberia named after the Iberian Peninsula as a necessary to protect the interests of the Christian Emperor D'Orleans Edward Moses Jr. trust protector of the Tribe of מֹשֶׁה Moses also known as the Atakapa Indian de Creole Nation.

**13.** Oil and Gas Leases

The Land known as New Spain or Spanish Louisiana is not under the United States dominion.   Rather the United States and Louisiana are acting as guardians over the property of the Atakapa Indians.   Where guardian secured secret interest in oil and gas lease granted in ward's lands, ward need not show damage to procure relief.[68] Ward held entitled to proceeds of guardian's fraudulent grant of oil and gas lease, where decree of cancellation was impossible as

---

[67] National Society of Professional Engineers v. United States 435 U.S. at 697, 98 S.Ct. at 1368 (citations omitted).

[68] United States v. Dunn, 268 U.S. 121, 45 S.Ct. 451, 69 L.Ed. 876 (1925)

against innocent purchaser. Id If the Sadistic European Doctrine of Conquest is allowed to prevail over the Rights vested in the Christian Emperor D'Orleans through the succession of William Moses Jr then his Majesty, his people, subjects, and assigns will suffer irreparable harm for which money cannot correct.

**III.**  that an injunction would not substantially injure other interested parties

**1.** 111TH CONGRESS 1ST SESSION S. J. RES. 14 ACKNOWLEDGMENT AND APOLOGY to American Native people. — The United States, acting through Congress

APRIL 30, 2009 Congress issued a Joint Resolution to acknowledge a long history of official depredations and ill-conceived policies by the Federal Government regarding Indian tribes and offered an apology to all Native Peoples on behalf of the United States.

**2.** 111TH CONGRESS 1ST SESSION S. CON. RES. 26 Congress' Apology to "African-Americans" for slavery and Jim Crow Laws

Resolved by the Senate (the House of Representatives concurring), that the sense of the Congress is the following:

(1) APOLOGY FOR THE ENSLAVEMENT AND SEGREGATION OF AFRICAN-AMERICANS. —The Congress— (A)

acknowledges the fundamental injustice, cruelty, brutality, and inhumanity of slavery and Jim Crow laws; (B) apologizes to African Americans on behalf of the people of the United States, for the wrongs committed against them and their ancestors who suffered under slavery and Jim Crow laws….

34

So long as the injunctive relief is "a reasonable method of eliminating the consequences of the illegal conduct," it may be rendered. Id. A preliminary and a permanent injunction transferring New Spain or Spanish Louisiana to the Tribe of Moses express spend Thrift Trust as guardian ad litem is a reasonable method of eliminating the consequences of the illegal Doctrine of Title by Discovery and the Sadistic Doctrine of Conquest.

### 3. United States and Louisiana (New Spain) conveyance of Land and water Titles

Edward Moses Jr's inheritance through intestate succession formerly known as New Spain or New Iberia named after the Iberian Peninsula. An absolute title to lands cannot exist, at the same time, in different persons, or in different governments. An absolute, must be an exclusive title, or at least a title which excludes all others not compatible with it. All of the United States institutions recognize the absolute title of the crown, subject only to the Indian right of occupancy, and they recognize the absolute right of the crown to extinguish that right…[69] and All of the United States institution recognize that the waters of the Mississippi and the lands of New Spain or Spanish Louisiana as a Sovereign Nation.

### 4. Violation of the Commerce Clause of the United States Constitution (U.S. Const. art. I, § 8, cl. 3)

The anticompetitive conduct in this case is not a foreseeable result of authority granted by the state. The State of Louisiana incorporated "the Council", but the State of Louisiana's restraint on trade frustrates interstate commerce because it did not grant the Council for Black Men and Boys authority to engage in corporate commercial trade. Municipal and state agencies are immune from antitrust laws only if actions taken were pursuant to "clearly articulated" state policy, and agency is acting pursuant to clearly articulated policy so long as anticompetitive

---

[69] Johnson v. M'Intosh, 21 U.S. 543, 588, 5 L.Ed. 681 (1823)

conduct is foreseeable result of authority granted by state.[70]  The State of Louisiana cannot clearly articulate a state policy that completely denies corporate commercial power to a corporation created for the success of black men and boys.  There can be no success without the ability to engage in interstate commerce.

The Atakapa Indian de Creole Nation (the "Atakapas") is an absolute sovereign indigenous nation of Louisiana, despite the United States having taken possession of the Atakapas' historical tribal land and trading and military posts in present day New Orleans, St. Martinville, Opelousas, New Iberia, Lafayette, Baton Rouge and Lake Charles, Louisiana.  Just like the Council for the Success of Black Men and Boys, the Atakapas "are being held as wards of the State through the Louisiana Governor's office ... [a]nd in pupilage under [the] United States[.]"[71]  His Majesty requests that a TEMPORARY RESTRAINING ORDER and preliminary and permanent Injunctions Issue without Notice to the adverse parties to enjoin and restrain the sadistic European Doctrine of Title by Discovery and their sadistic Doctrine of Conquest thereby releasing the American Iberian Empire.

**IV.** Public Interest Favors a Temporary Restraining Order and preliminary and permanent injunction.

U.S. News & World Report named Louisiana the worst state in the U.S. in its latest ranking comparing health care, education, infrastructure and other aspects of day-to-day life across the country.[72]  When the Court grants this TRO and preliminary injunction and permanent Injunction, the United States Government will incur no harm.  The Law of Nations expressly states that one state owes to another state whatever it owes to itself, so far as that other stands in real need of its assistance, and the former can grant it without neglecting the duties it

---

[70] Jackson v. W. Indian Co., Ltd., 944 F.Supp. 423 (D.V.I.1996)

[71] Atakapa Indian de Creole Nation v. Louisiana, 6:18-CV-00190, 2018 WL 4222830, at *1 (W.D. La. July 23, 2018), report and recommendation adopted, 6:18-CV-00190, 2018 WL 4089385 (W.D. La. Aug. 27, 2018)

[72] https://www.usnews.com/news/best-states/rankings

owes to itself. Such is the eternal and immutable law of nature.[73] Vattel, Emer de. Law of Nations

**1.** <u>American-l'iberian Indian Tribe of מֹשֶׁה Moses Family Integrity</u>

His Majesty contends that his family integrity is compromised by the sadistic European Doctrine of Title by Discovery and Doctrine of Conquest. His Majesty feels a painful sense of being separated from his ancient connections, and <u>united by force</u> to strangers. The United States has accepted responsibility for the injuries inflicted on his Majesty and his people. Plaintiffs have an undisputed vested substantive due process right to family integrity. Substantive due process protects parents' interest in "family integrity, and the care custody, and control of their children."[74] It also protects children's liberty interest in family association and integrity.[75] ("[T]here is a public interest in ensuring that [the child plaintiffs'] constitutional right to family association and integrity is upheld.");[76] ("a child's right to family integrity is concomitant to that of a parent"). The factual distinction in this case is immaterial to Plaintiffs' right to family integrity. Furthermore, defendants themselves have an important interest in promoting the CHRISTIAN EMPEROR, Edward Moses Jr and the Tribe of מֹשֶׁה Moses' family integrity:

> The state also shares the interest of the parent and child in their family's integrity,[77] ("the parens patriae interest favors preservation, not severance of natural familial bonds"), because the welfare of the state depends in large part on the strength of the family.

**V.** <u>His Majesty is likely to Succeed at Trial</u>

In White v. Cannon, the United States Supreme Court affirming the Louisiana Supreme Court, in effect, held: We part with the legal title by our patent, but we intend that it shall inure

---

[73] Vattel, Emer de. The Law of Nations (Natural Law and Enlightenment Classics) (Kindle Locations 5355-5357).
[74] M.G.U., 325 F. Supp. 3d at 119.
[75] See M.M.M. v. Sessions, No. 18-cv-1832, Order Granting Plaintiffs' Motion for Temporary Restraining Order (S.D. Cal., August 16, 2018)
[76] see, e.g., Wooley v. City of Baton Rouge, 211 F.3d 913, 923 (5th Cir. 2000)
[77] see Santosky v. Kramer, 455 U.S. 745, 766-67 (1982)]

to the party who actually inhabited and cultivated the land previous to February 22d, 1819, and we allow this matter to be litigated before the judicial tribunals of the country, and to be determined by them.[78] I am him, under the Cestui Que Vie Act of 1666 I represent my grandparents, and my ancestors through intestate succession of William Moses Jr as if they were still living.  It becomes then the ordinary case of a party acquiring, by false and fraudulent means, legal title to property to which another has the better right, and which he would have obtained, had the facts, as they existed been truly represented.[79]

In such case, equity compels the holder of the legal title to transfer it to the party who was justly entitled thereto.[80] Wherefore, the beneficiaries make a special election to this court to appoint the Tribe of מֹשֶׁה Moses express trust as guardian ad litem over the historic Louisiana territory, New Spain or New Iberia named after the Iberian Peninsula as a necessary to protect the interests of the Christian Emperor D'Orleans.

1.  <u>Jurisdiction – United States and Louisiana;</u>

The Louisiana Purchase Treaty was and is void, and was made without authority of law, and was never validated, the right of property being in the Tribe of מֹשֶׁה Moses express Spendthrift Trust, the United States Anglo Saxon government, having entered upon the Louisiana Territory realty, is to be deemed as having entered as a tenant under an implied lease, and is bound to pay as rent the just compensation secured by the Constitution to those whose property is taken for public use.[81]

---

[78] White v. Cannon, 73 U.S. 443, 449, 18 L.Ed. 923 (1867)
[79] State of Louisiana v. Judge of Commercial Court, 15 La. 192 (1840)
[80] White v. Cannon, 73 U.S. 443, 449, 18 L.Ed. 923 (1867)
[81] <u>Bradley to Use of Shepherd, to Use of Taylor, v. United States</u>, 13 Ct.Cl. 166, 170 (1877), aff'd sub nom. <u>Bradley v. United States</u>, 98 U.S. 104, 25 L.Ed. 105 (1878)

**2.** The 1803 Louisiana Purchase Treaty is not law because it was not ratified by the US Congress

"The common law has long recognized the sanctity of a person's home. Sir Edward Coke, in The Institutes of the Laws of England, 1628 stated: "For a man's house is his castle, et domus sua cuique est tutissimum refugium "and each man's home is his safest refuge."

In Freedman's Sav. & Tr. Co. v. United States, The Court held that it had frequently had occasion, when looking for analogies by which to ascertain the legal rights of claimants and liabilities of the government, to treat Congress as the principal and the executive officers as the agent.[82] And if this were an action against an ordinary principal, not a shadow of doubt could arise in any court as to his liability upon this lease.[83] But the legislative branch of the government is not an ordinary principal, and is not in all cases chargeable with knowledge of the acts of its agents, and the questions which lie at the bottom of this case are, whether the agent had authority to bind the government by the execution of the lease treaty; or whether his act, if without such authority, has been ratified by his principal, which here is Congress?[84]

Thomas Jefferson allegedly authored the Louisiana Purchase Treaty. The question here is whether President Jefferson had authority to bind the United States Congress by the execution of the Louisiana Purchase Treaty; or whether his act, without such authority, has been ratified by Congress.[85]  In Downes v. Bidwell, President Thomas Jefferson stated that, "The Constitution has made no provision for holding foreign territory, still less for incorporating foreign nations into the United States Union.[86] The Doctrine of Title by Discovery was well understood to convey the title which, according to the common law of European sovereigns respecting

---

[82] Freedman's Sav. & Tr. Co. v. United States, 16 Ct.Cl. 19, 24 (1880)
[83] id
[84] Id
[85] id
[86] Downes v. Bidwell, 182 U.S. 244, 253, 21 S.Ct. 770, 774, 45 L.Ed. 1088 (1901)

America, they might rightfully convey, and no more.[87] This was the exclusive right of the British Crown to purchase such lands as the Aboriginal negro natives were willing to sell. The crown could not be understood to grant what the crown did not affect to claim, nor was it so understood.[88] The United States Anglo Saxon Executive, President Thomas Jefferson stated that, "in seizing the fugitive occurrence of purchasing Aboriginal Ancestral Louisiana territory from France through a treaty which so much advances the good of the United States, have done an act beyond the Constitution."'[89]

Thus, Thomas Jefferson basically conceded that he did not have authority to bind the United States Congress to the Louisiana Purchase Treaty. A lease or contract void under the statute of frauds, for want of authority of the agent who executed it, will regulate the rights of the parties during the actual existence of the tenancy.[90] The rights and liabilities of the lessor and lessee are to be measured and determined by the lease under which possession was obtained, and it is not within the power of either party to change the terms of the tenancy without the assent of the other.[91] Thomas Jefferson further stated that 'This treaty must, of course, be laid before both Houses, because both have important functions to exercise respecting it.[92] The United States Congress did not ratify the 1803 Louisiana Purchase Treaty. Instead, Congress assembled on October 17, 1803 then Thomas Jefferson, in his message to Congress referred the whole matter to that body, saying that 'with the wisdom of Congress it will rest to take those ulterior measures which may be necessary for the immediate occupation and temporary government of the country;

---

[87] Worcester v. State of Ga., 31 U.S. 515, 517, 8 L.Ed. 483 (1832)
[88] id
[89] Downes v. Bidwell, 182 U.S. 244, 253, 21 S.Ct. 770, 774, 45 L.Ed. 1088 (1901)
[90] Bradley to Use of Shepherd, to Use of Taylor, v. United States, 13 Ct.Cl. 166, 170 (1877), aff'd sub nom. Bradley v. United States, 98 U.S. 104, 25 L.Ed. 105 (1878)
[91] id
[92] Downes v. Bidwell, 182 U.S. 244, 253, 21 S.Ct. 770, 774, 45 L.Ed. 1088 (1901)

for its incorporation into the Union.' Jefferson's Writings, vol. 8, p. 269.[93] A contract cannot be altered by one of the parties to it.[94]

In <u>Dougherty v. United States</u> the Surgeon General Finley made a written application to Quartermaster General for permission to rent the premises described, accompanying it with the written proposition of Miss English, of the terms she would lease to the United States, under date of June 24, 1861.[95] On the same day the Surgeon General directs Captain Rucker to close the contract with Miss English on the terms she proposes.  On the same day General Rucker enters into the contract on the terms proposed, promising, on behalf of the United States, to pay $300 per month, payable monthly, for the premises described, *so long as the United States shall* *occupy*; the possession and rent to commence on the 1st day of July 1861.[96]

**3.**  <u>The April 30, 1803 Louisiana Purchase Treaty</u>

Article X states as follows,

> "the present treaty Shall be ratified … and the ratifications Shall be exchanged in the Space of <u>Six months</u> after the date of the Signature by the Ministers Plenipotentiary or Sooner if possible."

The deadline for France and the United States to ratify the Louisiana Purchase Treaty was October 30, 1803.  Instead of ratifying the Louisiana Purchase treaty,  the Anglo-Saxon United States congress passed two bills, one on October 31, 1803, authorizing the President to <u>take</u> <u>possession</u> of the territory and to continue the existing government, and the other November 10, 1803 congress approved "An Act authorizing the creation of a stock, to the amount of eleven millions two hundred and fifty thousand dollars, for the purpose of carrying into effect the convention of the thirtieth of April, one thousand eight hundred and three, between the United

---

[93] <u>id</u>
[94] <u>Dougherty v. United States</u>, 5 Ct.Cl. 108, 113 (1869)
[95] <u>id</u>
[96] <u>Id</u>

States and the French Republic; and making provision for the payment of the same. [exhibit C] These acts continued in force until March 26, 1804, when a new act was passed providing for a temporary government (2 Stat. at L. 283, chap. 38), and vesting all legislative powers in a governor and legislative council, to be appointed by the President.[97] Concede, for the sake of argument, that the Louisiana Purchase Treaty was and is void, and was made without authority of law, and was never validated; the right of property being in the Tribe of מֹשֶׁה Moses Express Spendthrift Trust, the United States government having entered upon the Louisiana Territory realty, is to be deemed as having entered as a tenant under an implied lease  and is bound to pay as rent the just compensation secured by the Constitution to those whose property is taken for public use.[98]

Inasmuch as this court should declare that the defendants are without a title, on the ground that there is no Indian grant, nor any agreement, convention or treaty with the American Iberians or Atakapa Indian de Creole Nation to which the President, the legal representative of the Congress of the United States was a party.[99]; And in the absence of an express contract with the Louisiana Aboriginal Indians, or when the express contract is void, the government, the State of Louisiana and the United States is properly chargeable with the present value of the property which it has received and used.[100]  A lease for years, though void as to the term of years, is good for one year if the lessee enters, and the tenancy thereafter becomes a tenancy from year to year.[101] In this case, the United States is properly chargeable each year to pay the present value of $12,000,000 plus $11,250,000 in stock together at 100% interest compounded daily for a year

---

[97] Dougherty v. United States, 5 Ct.Cl. 108, 113 (1869)
[98] Bradley to Use of Shepherd, to Use of Taylor, v. United States, 13 Ct.Cl. 166, 170 (1877), aff'd sub nom. Bradley v. United States, 98 U.S. 104, 25 L.Ed. 105 (1878)
[99] Orleans Nav. Co. v. City of New Orleans, 2 Mart.(o.s.) 10, 27 (La. Super.1811)
[100] Bradley to Use of Shepherd, to Use of Taylor, v. United States, 13 Ct.Cl. 166, 170 (1877), aff'd sub nom. Bradley v. United States, 98 U.S. 104, 25 L.Ed. 105 (1878)
[101] id

to year lease with the American Aboriginal Indians of Post D'Atakapa for an approximate total of 400 years.

### 4.  Annulment of 1795 Spanish Treaty

The judicial power of this court extends to the Atakapa Indian de Creole Nation's claim because it rises in three foreign created treaty contracts; one being the October 27, 1795 Treaty of Friendship, Limits, and Navigation Between Spain (Iberian Kingdom) and The United States; Our "analysis must begin ... with the text of the treaty and the context in which the written words are used."[102] If the treaty contains "difficult or ambiguous passages," this court should go beyond the text of the treaty to consider general rules of construction as well as "the history of the treaty, the negotiations, and the practical construction adopted by the parties."[103]; see Zicherman v. Korean Air Lines Co., Ltd.,[104] (explaining that "a treaty ratified by the United States is not only the law of this land but also an agreement among sovereign powers" and thus "we have traditionally considered as aids to its interpretation the negotiating and drafting history (travaux préparatoires) and post-ratification understanding of the contracting parties").  Applying this framework under the settled rules by which leases are construed, this court should conclude that the Spanish Treaty of 1795 is void and does not apply in this case.[105][106]

---

[102] Air France, 470 U.S. at 397, 105 S.Ct. 1338.

[103] E. Airlines, Inc. v. Floyd, 499 U.S. 530, 535, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (internal quotation marks omitted)

[104] Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996)

[105] Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd., 882 F.3d 1033, 1039–40 (11th Cir.2018)

[106] Bradley to Use of Shepherd, to Use of Taylor, v. United States, 13 Ct.Cl. 166, 171 (1877), aff'd sub nom. Bradley v. United States, 98 U.S. 104, 25 L.Ed. 105 (1878)

5. message to Indian Chief Brother Handsome Lake, United States President Thomas Jefferson

On November 3, 1802 in a message to Indian Chief Brother Handsome Lake, United States President Thomas Jefferson defined the parameters of the European Doctrine of Discovery to wit:

> You remind me, brother, of what I said to you, when you visited me the last winter, that the lands you then held would remain yours, and shall never go from you but when you should be disposed to sell. This I now repeat and will ever abide by. We, indeed, are always ready to buy land; but we will never ask but when you wish to sell; and our laws, in order to protect you against imposition, have forbidden individuals to purchase lands from you; and have rendered it necessary, when you desire to sell, even to a State, that an agent from the United States should attend the sale, see that your consent is freely given, a satisfactory price paid, and report to us what has been done, for our approbation.
>
> This was done in the late case of which you complain. The deputies of your nation came forward, in all the forms which we have been used to consider as evidence of the will of your nation. They proposed to sell to the State of New York certain parcels of land, of small extent, and detached from the body of your other lands; the State of New York was desirous to buy. I sent an agent, in whom we could trust, to see that your consent was free, and the sale fair. All was reported to be free and fair. The lands were your property. The right to sell is one of the rights of property. To forbid you the exercise of that right would be a wrong to your nation.

Free consent and Fair sale. All the nations of Europe, who have acquired territory on this continent, have asserted in themselves, and have recognized in others, the exclusive right of the discoverer to appropriate the lands occupied by the Indians.[107] A construction should be preferred which preserves rather than destroys the contract.[108] A rational and just construction will be preferred to one which is unreasonable.[109] The whole contract should be construed in

---

[107] Johnson v. M'Intosh, 21 U.S. 543, 584, 5 L.Ed. 681 (1823)
[108] Bradley to Use of Shepherd, to Use of Taylor, v. United States, 13 Ct.Cl. 166, 171 (1877), aff'd sub nom. Bradley v. United States, 98 U.S. 104, 25 L.Ed. 105 (1878)
[109] Id

determining the meaning of its parts.[110] A invalid, void, or illegal contract which is an entirety cannot be enforced in part and rescinded in part.[111]

**6.**  ART. II. Of the Treaty of October 27, 1795; the United States Boundary lines

This provision of the treaty outlines the boundary lines between American Iberian Empire and The United States as follows:

> To prevent all disputes on the subject of the boundaries which separate the territories of the two High contracting Parties, it is hereby declared and agreed as follows:
>
> to wit: The Southern boundary of the United States which divides their territory from the Spanish Colonies of East and West Florida, shall be designated by a line beginning on the River Mississippi at the Northernmost part of the thirty first degree of latitude North of the Equator, which from thence shall be drawn due East to the middle of the River Apalachicola or Catahouche, thence along the middle thereof to its junction with the Flint, thence straight to the head of St Mary's River, and thence down the middle thereof to the Atlantic Ocean….

**7.**  ART. V. Of the Treaty of October 27, 1795; actio utilis - the advantages were intended for a third person

If the advantages were intended for a third person, natural or corporate, who was not a party to the agreement, there results for him the actio utilis under Roman Civil Law or a "Stipulation pour autrui" French Civil Law…. [112] The Treaty of October 27, 1795 grants advantages intended for a third party, the Indians of the Spanish Kingdom.

> The two High contracting Parties shall by all the means in their power maintain peace and harmony among the several Indian Nations who inhabit the country adjacent to the lines and Rivers which by the proceeding Articles form the boundaries of the two Floridas;
>
> It is hereby agreed that …both Parties will endeavour to make the advantages of the Indian trade common and mutually beneficial to their respective Subjects and Citizens observing in all things the

---

[110] id
**[111]** id
[112] Orleans Nav. Co. v. City of New Orleans, 2 Mart.(o.s.) 10, 39 (La. Super.1811)

> most complete reciprocity: so that both Parties may obtain the
> advantages arising from a good understanding with the said
> Nations….

Words are not always to be understood in their strict grammatical sense the intention of the party who utters them is to be considered.[113] The goal of treaty interpretation is to determine parties' actual intention, because it is the court's responsibility to give treaty's specific words meaning consistent with contracting parties' shared expectations.[114] Under federal common law, contract's language's plain meaning governs its interpretation.[115] Under federal common law, document should be read to give effect to all its provisions and to render them consistent with each other.[116] Under federal common law, the court may apply rule of construction that ambiguous contract provision should be construed against drafter only after applying other rules of construction and considering extrinsic evidence, including about industry custom and practice.[117] In this case, both Spain and the United States agreed by ratified treaty to engage in commercial intercourse with the Indians of Post D'Atakapa. A contract or lease entered into by an officer of the government, under the authority of an existing statute, or subsequently ratified by Congress, cannot be annulled or changed, except in the manner therein provided for, if any, or by the consent of all the contracting parties.[118] In this respect the United States occupy the same position and are subject to the same rules of law as individuals. They cannot evade or escape contract obligations and liabilities. [119]

---

[113] id
[114] Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd., 882 F.3d 1033, 1039–40 (11th Cir.2018)
[115] id
[116] Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd., 882 F.3d 1033, 1039–40 (11th Cir.2018)
[117] Freedman's Sav. & Tr. Co. v. United States, 16 Ct.Cl. 19, 24 (1880)
[118] id
[119] id

**8.**  John Adams - June 12, 1797; Message to the Senate and House;

His Catholic Majesty of Spain … declared their intention to maintain his jurisdiction, and to suspend the withdrawing his troops from the military posts they occupy within the territory of the United States until the two Governments shall, by negotiation, have settled the meaning of the second article respecting the withdrawing of the troops, garrisons, or settlements of either party in the territory of the other-that is, … until the Spanish officers are sure the Indians will be pacific. The two first questions, if to be determined by negotiation, might be made subjects of discussion for years, and as no limitation of time can be prescribed to the other, a certainty in the opinion of the Spanish officers that the Indians will be pacific, it will be impossible to suffer it to remain an obstacle to the fulfillment of the treaty on the part of Spain.

To … remove the second  obstacle John Adams asserted that he shall cause an assurance to be published and to be particularly communicated to the minister of His Catholic Majesty of Spain and to the governor of Louisiana that the settlers or occupants of the lands in question shall not be disturbed in their possessions by the troops of the United States, but, on the contrary, that they shall be protected in all their lawful claims; and to prevent or remove every doubt on this point it merits the consideration of Congress whether it will not be expedient immediately to pass a law giving positive assurances to those inhabitants who, by fair and regular grants or by occupancy, have obtained legal titles or equitable claims to lands in that country prior to the final ratification of the treaty between the United States and Spain on the 25th of April, 1796.

**9.**  Jefferson's Draft on an Amendment to the Constitution: 1803

In response to John Jay's message to congress President Thomas Jefferson drafted the

aforesaid amendment to the Louisiana Purchase Treaty.

The province of Louisiana is incorporated with the U. S. and made part thereof. The rights of occupancy in the soil, and of self-government, are confirmed to the Indian inhabitants, as they now exist. Pre-emption only of the portions rightfully occupied by them, and a succession to the occupancy of such as they may abandon, with the full rights of possession as well as of property and sovereignty in whatever is not or shall cease to be so rightfully occupied by them shall belong to the U. S.

The legislature of the Union shall have authority to exchange the right of occupancy in portions where the U. S. have full right for lands possessed by Indians within the U. S. on the East side of the Mississippi, to exchange lands on the East side of the river for those on the West side thereof and above the latitude of 31 degrees; to maintain in any part of the province such military posts as may be requisite for peace or safety; to exercise police over all persons therein, not being Indian inhabitants; to work salt springs, or mines of coal, metals and other minerals within the possession of the U. S. or in any others with the consent of the possessors; to regulate trade and intercourse between the Indian inhabitants and all other persons; to explore and ascertain the geography of the province, its productions and other interesting circumstances; to open roads and navigation therein where necessary for beneficial communication and to establish agencies and factories therein for the cultivation of commerce, peace and good understanding with the Indians residing there.

The legislature shall have no authority to dispose of the lands of the province otherwise than is hereinbefore permitted, until a new Amendment of the constitution shall give that authority. Except as to that portion thereof which lies south of the latitude of 31 degrees; which whenever they deem expedient, they may erect into a territorial Government, either separate or as making part with one on the eastern side of the river, vesting the inhabitants thereof with all the rights possessed by other territorial citizens of the U.S.

**10.** 8 U.S.C.A. § 1489. Application of treaties; exceptions

Nothing in this subchapter shall be applied in contravention of the provisions of any treaty or convention to which the United States is a party and which has been ratified by the Senate before December 25, 1952

**11.** 28 U.S.C.A. § 1333. Admiralty, maritime and prize cases

The district courts shall have original jurisdiction, exclusive of the courts of the States,

of:

any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

Any prize brought into the United States and all proceedings for the condemnation of property taken as prize.

11.   U.S. Const. amend. V Takings clause

* * * nor shall private property be taken for public use, without just compensation.

12.   EQUAL PROTECTION VIOLATIONS

**1.** 42 U.S.C.A. § 1981. Equal rights under the law

i.   Statement of equal rights.

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

ii.   "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**2.** La. Rev. Stat. Ann. § 49:1212 Council on the Success of Black Men and Boys

The council on the success of Black men and boys became effective law on August 1, 2018. It is a body corporate and public, exercising public and essential governmental functions. The custom and practice in Louisiana is to grant a corporate body all the powers of a corporation and the ability to become a political community.  In this instance, the Council is only given the power to study and report to the Governor.  The statute does not grant the Council any corporate powers.  Thereby restraining trade and frustrating interstate commerce.  Under 42 U.S.C.A. § 1981 all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts.

 In Sakamoto v. Duty Free Shoppers, Ltd. the court held that an exclusive franchise agreement under which only one business was permitted to sell and deliver gifts at the Guam airport terminal was rationally related to the desire to raise revenue for the airport and to regulate traffic and security at the airport, so that the exclusive franchise arrangement did not deny equal protection to a business which did not obtain the exclusive franchise.[120]

**3.** Body corporate; powers

The law of nations is the science which teaches the rights subsisting between nations or states, and the obligations correspondent to those rights.[121] The ROYAL CROWN, LTD constitutes a body corporate and politic in law[122] It is therefore necessary that nations should acquire a knowledge of the obligations incumbent on it, in order that he may not only avoid all violations of his duty, but also be able distinctly to ascertain his rights, or what he may lawfully require from other nations.[123]

---

[120] Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285 (9th Cir.1985)
[121] Emir De Vattel, "The Law of Nations"
[122] La. Rev. Stat. Ann. § 28:242
[123] Emir De Vattel, "The Law of Nations"

The law of nature declares every nation free and independent of all the others.[124] with exclusive lease agreements with Louisiana and the United States; The ROYAL CROWN, LTD possesses all the powers of a corporation together with all the powers and rights of a political subdivision of a Royal Devine Nation-State as provided by the Covenant of One Heaven; relating to the incurring of debt and the issuing of Stocks and bonds therefor. Said Royal Devine Nation-State, through the Emperor De' Orleans, may incur debt and issue negotiable Instruments and create a national currency and Foreign alliances and allegiances in accordance with the power and authority of the Covenant of One Heaven and in the form and manner and with the effect and security now provided by the Law of Nations, the United Nation, State of Louisiana and the United States.

This Royal Nation-State, through the Emperor De' Orleans should have exclusive power to incur debt and contract obligations in accordance with the Covenant of One Heaven, claim Absolute Royal Devine Sovereign Immunity; have a corporate seal; the ROYAL CROWN, LTD should have exclusive power to do and perform any and all acts in its corporate capacity and in its corporate name which are necessary and proper for carrying out the purposes and objects for which it is created.[125] The ROYAL CROWN, LTD should have exclusive power of eminent domain. The ROYAL CROWN, LTD should have exclusive power to expropriate or confiscate property for all its purposes and objectives, in accordance with the constitution and laws of the state of Louisiana, the United States, and the Covenant of One Heaven. The ROYAL CROWN, LTD should have exclusive power to construct, lease, maintain, acquire, enlarge and operate any facility or do any other thing necessary for the use and purpose of the Royal Nation-State. The ROYAL CROWN, LTD should have exclusive power to should have the power to own in full

---

[124] id
[125] LSA-R.S. 28:242 body Corporate; powers

ownership any facilities and may acquire the same by donation, confiscation, expropriation, prescription or otherwise.

In Jackson v. W. Indian Co., Ltd., the court held that an agreement by cruise ship operator, an instrumentality of Virgin Islands government, granting to taxi association members exclusive right to pick up all "independent" cruise ship passengers from operator's dock was rationally related to legitimate state goal of ensuring orderly and efficient taxi service at cruise docks, and thus did not violate equal protection rights of taxi drivers who were not members of association.[126] By virtue of the 1795 Spanish treaty of friendship and the Judgement of possession from the Succession of William Moses Jr his Majesty possesses a vested interest in the establishment of the Council for the Success of Black men and Boys.  This court's issuance of a perpetual exclusive franchise for the ROYAL CROWN, LTD therefore is rationally related to the desire to raise revenue for the Council but at the same time it will serve to regulate commercial membership traffic with security for the Nation; and to regulate traffic from outside businesses seeking entrance into the State of Louisiana to capitalize on this present market value.

**4.**  Is the United States a Corporation that is subject to suit?

Yes, under 28 U.S.C.A. § 3002 Federal Debt Collection Procedure

Definition

(15) "United States" means—

A.    a Federal corporation;

B.    an agency, department, commission, board, or other entity of the United States; or

C.    an instrumentality of the United States.

---

[126] Jackson v. W. Indian Co., Ltd., 944 F.Supp. 423 (D.V.I.1996)

The United States thus is a juristic person in the sense that it has capacity to sue OR be sued upon contracts made with it or in vindication of its property rights. [127]

The Doctrine of Discovery is an anti-trust monopolistic doctrine used by European Invaders to illegally transfer ownership of land from the indigenous people of America to their respective Governments. Europeans use the Doctrine of Conquest to exercise dominion over the Indigenous people of the land once they completed the illegal transfer of land. His Majesty contends that the defendants are once again engaging in antitrust violations and monopolization of domestic, international and intergalactic[128] commercial markets that, unless enjoined and restrained, will imminently and immediately put his Majesty out of business.[129]

13. Vested Rights

**1.** A right is vested so that it may not constitutionally be divested under Due Process and Contract Clauses

      a. Proper title attaches petitioner back to land and rights

Unless verdict or judgment has been rendered, there is no presumption against retroactive application of statute which prohibits plaintiff from obtaining monetary relief from local government and its officials for violation of antitrust laws.[130] When the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest; right must be absolute, complete and unconditional, independent of a contingency, and a

---

[127] United States v. Cooper Corp., 312 U.S. 600, 604, 61 S.Ct. 742, 743, 85 L.Ed. 1071 (1941)

[128] United States Space Force - The **United States Space Force** (**USSF**) is the sixth branch of the United States Armed Forces, which is intended to have control over military operations in outer space. It has been noted that the most powerful institutions in national security are the military services, yet there is no military service dedicated to promote outer space activities.

[129] See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc., 549 F.3d 1079, 1089 (7th Cir. 2008) (evidence of "severe financial stress . . . that could ultimately force [a company] into insolvency," or evidence of a "risk to the organization's significant goodwill," supports a finding of irreparable harm for which there is no adequate remedy at law); Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984) (damages ready is inadequate when the "damage award may come too late to save the plaintiff's business" (quoting Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1204–05 (2d Cir. 1970) (Friendly, J.)).

[130] Jefferson Disposal Co., Inc. v. Jefferson Par., La., 603 F.Supp. 1125 (E.D. La.1985)

mere expectancy of future benefit does not constitute a vested right.[131] The Christian Emperor Edward Moses Jr. Trust Protector of the American-Iberian Tribe of מֹשֶׁה Moses also known as Atakapa Indian Nation through the intestate succession judgement of William Moses Jr possess a vested right to recover tribal ancestral property wherever found; a right which is protected under the Due Process and Contract Clauses of the United States Constitution.

In construing treaties between nations, it cannot be presumed that either state intends to provide the means of perpetrating or protecting fraud, but all provisions are to be construed as intended to be applied to bona fide transactions.[132]  Under law of Spain the African slave trade is abolished and negroes thereby introduced into dominions of Spain are free.[133] Spain is located on the Iberian Peninsula.  The Atakapa Indians of New Iberia, La., named after the Iberian Peninsula or Spanish Louisiana or New Spain acquired a vested right in the commercial contract with the United States and the Iberian Kingdom the moment that the United States and the "Vatican" appointed Catholic King of Spain (Iberian Kingdom) ratified the 1795 Friendship Treaty.

Both Spain and the United States agreed by ratified treaty to engage in commercial intercourse with the Indians of Post D'Atakapa.  A contract or lease entered into by an officer of the government, under the authority of an existing statute, or subsequently ratified by Congress, cannot be annulled or changed, except in the manner therein provided for, if any, or by the consent of all the contracting parties.  In this respect the United States occupy the same position and are subject to the same rules of law as individuals. They cannot evade or escape contract obligations and liabilities thus acquired by a failure on the part of Congress to make the necessary appropriations.[134]

---

[131] Ebinger v. Venus Const. Corp., 2010-2516 (La. 7/1/11), 65 So.3d 1279
[132] The Amistad, 40 U.S. 518, 521, 10 L.Ed. 826 (1841)
[133] id
[134] Freedman's Sav. & Tr. Co. v. United States, 16 Ct.Cl. 19, 24 (1880)

Under the settled rules by which leases are construed.  A lease void under the statute of frauds, for want of authority of the agent who executed it, will regulate the rights of the parties during the actual existence of the tenancy.[135] The rights and liabilities of the lessor and lessee are to be measured and determined by the lease under which possession was obtained, and it is not within the power of either party to change the terms of the tenancy without the assent of the other. [136] Under the Due Process and Contract Clauses of both the United States and Louisiana Constitutions, a law may not be applied retroactively if it would impair contractual obligations or disturb vested rights.[137] A cause of action accrues when a party has the right to sue. Id. Once a party's cause of action accrues, it becomes a vested property right that may not constitutionally be divested under Due Process and Contract Clauses of state and federal constitutions.id In this case, the right to enjoyment, present or prospective, has become the property of the Tribe of מֹשֶׁה Moses a result of William Moses Jr Succession Judgement.  The Right to the Atakapa Indians property belongs to the heirs of the Tribe of מֹשֶׁה Moses Express Spendthrift Trust.  His Majesty's succession judgment is a present interest; The Christian Emperor's final succession judgment is absolute, complete and unconditional, independent of a contingency or a mere expectancy of future benefit which constitutes a vested right which may not constitutionally be divested.[138]

The goal of treaty interpretation is to determine parties' actual intention because it is the court's responsibility to give a treaty's specific words meaning consistent with contracting parties' shared expectations.[139]  Under federal common law, [sic] contract language plain meaning governs its interpretation. Id.  Under Treaty interpretation, documents should be read to give

---

[135] Bradley to Use of Shepherd, to Use of Taylor, v. United States, 13 Ct.Cl. 166, 171 (1877), aff'd sub nom. Bradley v. United States, 98 U.S. 104, 25 L.Ed. 105 (1878)
[136] id
[137] Ebinger v. Venus Const. Corp., 2010-2516 (La. 7/1/11), 65 So.3d 1279
[138] id
[139] Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd., 16-10985, 2018 WL 914780 (11th Cir. Feb. 16, 2018)

effect to all its provisions and to render them consistent with each other.id. As a general matter, the United States becomes a "party" to a treaty, that is, becomes contractually bound to obey its terms, only when, upon concurrence of two thirds of the Senators present, the President ratifies the treaty. [140][141]  By this definition of "party" the United States is contractually bound by year to year lease agreement to obey the terms of both the Spanish/US Treaty of 1795 and the French/US treaty of 1800. A lease for years, though void as to the term of years, is good for one year if the lessee enters, and the tenancy thereafter becomes a tenancy from year to year.[142] In this case, the United States is properly chargeable each year to pay the present value of $12,000,000 plus $11,250,000 in stock for a year to year lease with the American Aboriginal Indians of Post D'Atakapa for an approximate total of 400 years.

### 2.  28 U.S.C.A. § 2241 Application for Writ of Habeas Corpus

(c)The writ of habeas corpus shall not extend to a prisoner unless--(c)

> (1) He is in custody under or by color of the authority of the United States. 28 U.S.C.A. § 2241

### 3.  Baton Rouge City Police Alarm Use Violation Final Notice

The Christian Emperor is under constructive custody therefore he is entitled to a writ of Habeas Corpus. On or about December 7, 2018 The City of Baton Rouge issued his Majesty a "FINAL NOTICE" informing him that under City Ordinance 9:422, 9:423, and 9:424 "All users of residential and business alarms inside the city limits of Baton Rouge must have a permit" The City commanded his Majesty to comply with the notice or a Misdemeanor Summons (Citation) will be issued under City Ordinance 9:422, which may result in fines up to $250.00 per false alarm.  If this court does not enjoin and restrain the Baton Rouge Police Department then his Majesty will suffer irreparable harm (for which money damages cannot compensate) Thus, the

---

[140] U.S.C.A. Const. Art. 2, § 2, cl. 2.
[141] Ozaltin v. Ozaltin, 708 F.3d 355 (2d Cir.2013)
[142] id

Balance of Harms and Public Interest Favor a Temporary Restraining Order and preliminary injunction.

**4.** The Atakapa Indian Nation of Spanish Louisiana is in fact an Absolute sovereign and independent Nation

> §1. What is meant by a nation or state? Nations or states are bodies politic, societies of men united together for the purpose of promoting their mutual safety and advantage by the joint efforts of their combined strength.[143]

The definitions given by the emperor Justinian, of the law of nature, the law of nations, and the civil law, are well known. "The law of nature" says he, "is that which nature teaches to all animals":† thus he defines the natural law in its most extensive sense, not that natural law which is peculiar to man, and which is derived as well from his rational as from his animal nature. "The civil law," that emperor adds, "is that which each nation has established for herself, and which peculiarly belongs to each state or civil society. And that law, which natural reason has established among all mankind, and which is equally observed by all people, is called the law of nations, as being a law which all nations follow."[144] Louisiana is the only Civil law state in the union. The very term 'nation,' so generally applied to them, means 'a people distinct from others.' The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and, consequently, admits their rank among those powers who are capable of making treaties. The words 'treaty' and 'nation' are words of the Europeans own language, selected in European diplomatic and legislative proceedings, by European Nations, having each a definite

---

[143] Vattel, Emer de. The Law of Nations (Natural Law and Enlightenment Classics) . Liberty Fund Inc.. Kindle Edition.
[144] Id.

and well understood meaning. European Nations have applied them to Indians, as Europeans have applied them to the other nations of the earth. They are applied to all in the same sense.[145]

Louisiana is <u>a country or Nation</u> almost entirely occupied by numerous tribes of aboriginal Indians, who are in fact sovereign and independent.[146] The Atakapa and Opelousas Aboriginal Indians were the allies of France and Spain, but not their subjects, never having been in any manner conquered by them, and held the country or Nation of Louisiana in absolute sovereignty, as an independent sovereign nation, both as to the right of jurisdiction and sovereignty, and the right of soil, except a few military posts, and a small territory around each which they had ceded to France, and she held under them, and among which were the aforesaid post D'Atakapa; and that these Indians, after the 1795 treaty, became the allies of Spain, living under her protection as they had before lived under that of France, but were free and independent, owing no allegiance to any foreign power whatever, and holding their lands in absolute property; the territories of the respective tribes being separated from each other, and distinguished by certain natural marks and boundaries to the Indians well known, Baton Rouge; A Red Staff.  And each tribe claiming and exercising separate and absolute ownership, in and over its own territory, both as to the right of sovereignty and jurisdiction, and the right of soil.[147]

**5.** <u>Application for Writ of Habeas Corpus is not confined to those in jail or like physical confinement</u>

As mentioned earlier it was established in the seminal case on the issue of Royal Sovereignty <u>Johnson v. M'Intosh</u> the United States Supreme Court found that Spanish Louisiana, New Spain or French Louisiana … is a country that is entirely occupied by numerous tribes of Aboriginal Indians, <u>who are in fact independent</u>.[148]  In the Amistad case the court found that free

---

[145] <u>Worcester v. State of Ga.</u>, 31 U.S. 515, 519, 8 L.Ed. 483 (1832)
[146] <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 587, 5 L.Ed. 681 (1823)
[147] <u>id</u>
[148] <u>id</u>

born Africans are not within the jurisdiction of the United States or any of her states.[149]  Thus, this cause came on to be heard on the transcript of the record of the <u>District Court of the United States for the district of Louisiana</u>.[150]

His Majesty is in custody or otherwise restrained such that he is absolutely entitled to habeas relief.[151] The United States Supreme Court in <u>Jones v. Cunningham</u> held that in the state courts, as in England, habeas corpus has been widely used by parents disputing over which is the fit and proper person to have custody of their child.[1213] History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus.[152]

The term 'Indians,' as ordinarily used when referring to persons in the United States, is understood to refer to the members of that Aboriginal race of men who inhabited North America when it was found by Caucasian people.[153]  By the St. of 1869, c. 463, § 1, "all Indians, <u>and "people of color", heretofore known and called Indians</u>, within this Commonwealth, are hereby made and declared to be citizens of the Commonwealth….[154]  The Atakapas "are being held as wards of the State through the Louisiana Governor's Office of Indian Affairs ... [a]nd in pupilage under [the] United States.  Under U.S. Const. amend. XIII, § 1 Neither slavery nor involuntary servitude…shall exist within the United States, or any place subject to their jurisdiction. This court should find that his Majesty did in fact make proper allegations that his property, liberty

---

[149] <u>The Amistad</u>, 40 U.S. 518, 521, 10 L.Ed. 826 (1841)
[150] <u>La Amistad De Rues</u>, 18 U.S. 385, 393, 5 L.Ed. 115 (1820)
[151]  <u>Atakapa Indian de Creole Nation v. Louisiana</u>, 6:18-CV-00190, 2018 WL 4222830, at *3 (W.D. La. July 23, 2018), <u>report and recommendation adopted</u>, 6:18-CV-00190, 2018 WL 4089385 (W.D. La. Aug. 27, 2018) (Rec Doc 13 pg 1-2)
[152] <u>Jones v. Cunningham</u>, 371 U.S. 236, 240, 83 S.Ct. 373, 376, 9 L.Ed.2d 285 (1963)
[153] <u>Frazee v. Spokane Cty.</u>, 29 Wash. 278, 286, 69 P. 779, 782 (1902)
[154] <u>Danzell v. Webquish</u>, 108 Mass. 133, 134–35 (1871)

and freedom to rule his Nation are restrained with intent to injure by the United States and the State of Louisiana and its political subdivisions.

The habeas corpus jurisdictional statute implements the constitutional command that the writ of habeas corpus be made available.[2] While limiting its availability to those 'in custody,' the statute does not attempt to mark the boundaries of 'custody' nor in any way other than by use of that word attempt to limit the situations in which the writ can be used. To determine whether habeas corpus could be used to test the legality of a given restraint on liberty, this Court has looked to common-law usages and the history of habeas corpus both in England and in this country. [155] Issuance of the Great Writ is a civil proceeding, cognizable by courts of exclusively civil jurisdiction. The proceeding by habeas corpus has always been regarded in England as a civil proceeding.[156] The writ of habeas corpus may be used in civil as well as in criminal and political cases. A tutor deprived of the custody of his ward, or a husband of the company of his wife, may seek a restoration to their rights by a recourse to a writ of habeas corpus; so, may a debtor, illegally confined in a civil case. [157]

Accordingly, the illegal detention of his Majesty's tribal people as wards, pupils of the federal and state government, and deprivation of their birthrights, privileges and their property are sufficient enough to invoke the jurisdiction of this court for an order granting his writ of habeas corpus.[158]  His Majesty added members of the Secretary of State and the Bureau of Indian

[155] Jones v. Cunningham, 371 U.S. 236, 238, 83 S.Ct. 373, 374–75, 9 L.Ed.2d 285 (1963)
[156] State of Louisiana v. Judge of Commercial Court, 15 La. 192, 193 (1840) See Bacon's Ab., title Habeas Corpus ad subjiciendum; and Bushell's case in Vaughan's Reports.
[157] Hyde v. Jenkins, 6 La. 427, 436 (1834)
[158] Atakapa Indian de Creole Nation v. Louisiana, 6:18-CV-00190, 2018 WL 4222830, at 1 (W.D. La. July 23, 2018), report and recommendation adopted, 6:18-CV-00190, 2018 WL 4089385 (W.D. La. Aug. 27, 2018); **§ 1154. Procedure for granting immigrant status s (a) Petitioning procedure**
**(1)(A)(i)** Except as provided in clause (viii), any National of America or citizen of the United States claiming that an alien(ward) is entitled to classification by reason of a relationship described in paragraph (1), (3), or (4) of section 1153(a) of this title or to an immediate relative status under section 1151(b)(2)(A)(i) of this title may file a petition with the Attorney General for such classification.

59

Affairs[159] as parties respondent squarely raises the question of whether the United States, State of Louisiana, and the Bureau of Indian Affairs now hold petitioner and his people in their 'custody' within the meaning of 28 U.S.C. s 2241 such that he can by habeas corpus require the United States, the State of Louisiana, the city of Baton Rouge and the Bureau of Indian Affairs to point to and to defend the law other than the illegal law of conquest by which it justifies any restraint on the Christian Emperor's liberty. [160]

The question is whether the United States, Louisiana, the city of Baton Rouge and the Bureau of Indian Affairs significantly restrain his Majesty's liberty to do those things which in this country free men are entitled to do.   Such restraints are enough to invoke the help of the Great Writ of Habeas Corpus.  Of course, that writ always could and still can reach behind prison walls and iron bars. But it can do more. It is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty. Id

His Majesty is not in immediate physical imprisonment however, the painful sense of being separated from their ancient connections, and united by force to strangers through the Europeans sadistic Doctrine of Conquest[161]; being classified as Ward, or pupil of the State and Federal Government imposes conditions which significantly confine and restrain his Majesty's leadership and his tribal peoples' freedom and property which taken as a whole is enough to keep them in the 'custody by illegal conquest' of Louisiana and the United States within the meaning of the habeas corpus statute; thus if his Majesty can prove his allegations then this 'custody' is in violation of the 4th amendment, 5th Amendment, 13th amendment, and 14th Amendment to the Constitution. "[W]hen an alleged deprivation of a constitutional right is involved, most courts

---

[159] (Rec Doc 38-2 pg 2)
[160] Jones v. Cunningham, 371 U.S. 236, 241, 83 S.Ct. 373, 376, 9 L.Ed.2d 285 (1963)
[161] Johnson v. M'Intosh, 21 U.S. 543, 588–89, 5 L.Ed. 681 (1823)

hold that no further showing of irreparable injury is necessary." As a result, the balance of harms and public interest favor a temporary restraining order and a preliminary injunction.

WHEREFORE, the CHRISTIAN EMPEROR de ORLEANS seeks protection from a wrongful injury and restraint upon his liberty to be free from prosecution for failure to obtain an Alarm User Permit and prays for an order issuing his Majesty's writ of Habeas Corpus and an order granting him an emergency preliminary injunction, permanent injunction and a temporary restraining order thus restraining the United States, Louisiana, and other defendants both known and unknown against <u>erosion of his Majesty's absolute right to absolute sovereignty and the absolute right to be free from illegal and Sadistic Doctrine of European Conquest and separation injury</u>. His Majesty further prays for an order to restrain the defendants named in his verified complaint from engaging in anti-trust monopolistic commercial activity that further injures the Royal Crown. Finally, his Majesty prays that the "EMERGENCY TEMPORARY RESTRAINING ORDER" restraining the sadistic Doctrine of European Conquest be issued without notice and be extended from time to time until the parties can set a hearing date for a preliminary and final injunction respectively.

<table>
<tr><td>

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties in the matter by operation of the court's electronic filing system.

S/<u>Edward Moses Jr</u>

</td><td>

Respectfully Submitted

BY: /s/ Edward Moses Jr (B/N:30646)

MOSES LAW FIRM, L.L.C.
2900 Westfork Drive Ste 401
Baton Rouge, Louisiana 70827
Telephone (225) 295-5632
Telecopier (888)518-0559
Email: edward@moses-lawfirm.com

</td></tr>
</table>